687 S.E.2d 720

**Emily B. SMITH, Appellant/Respondent,**

v.

**Jeffrey O. SMITH, Respondent/Appellant.**

**No. 4638.**

Court of Appeals of South Carolina.

Heard Sept. 1, 2009.
Decided Dec. 9, 2009.

252

254

256

Jan L. Warner and Matthew E. Steinmetz, both of Columbia, for Appellant/Respondent.

Thomas M. Neal III, Yulee E. Harrison, both of Columbia, and G. Murrell Smith, Jr., of Sumter, for Respondent/Appellant.

HEARN, C.J.

In this cross-appeal, Emily Smith (Mother) contends the family court erred by refusing to: (i) deviate from the child support guidelines and include the cost of the parties' daughter's private school tuition in calculating child support; (ii) require Jeffrey Smith (Father) to obtain life insurance as security for his alimony and child support obligations; (iii) consider the cost of Mother's medical insurance in awarding alimony; (iv) find the tobacco bonds and Sumter residence titled in Father's name were subject to equitable division; and (v) award her attorney's fees and costs. In his appeal, Father asserts the family court erred in failing to impute income to Mother and in setting the visitation schedule. We affirm in part, reverse in part, and remand.

## FACTS

Mother and Father met and began dating when Father was stationed at Shaw Air Force Base in Sumter and married in

1990. During the next year, they moved into a house in Sumter, and Father, after completing his service obligation to the Air Force, accepted employment as a pilot with Delta Airlines. Meanwhile, Mother continued working as a schoolteacher in the Sumter County School System.

In 2001, Mother and Father adopted a daughter, Kate, who was fourteen-months-old at the time. After bringing Kate home in March 2001, they completed an application for Kate to attend a local private school, Wilson Hall, once she reached the appropriate age. In addition, the parties decided Mother would no longer teach in the public school system following the current school year. Instead, they agreed Mother would apply for a teaching position at Wilson Hall so she could spend more time at home with Kate. Mother was hired as a teacher at Wilson Hall for the following year.

During this time, Father's mother, Janie Carraway (Grandmother), lived in Royal Palm Beach, Florida with her husband. After her husband's death, Grandmother sought to purchase a home closer to her part-time job and the residence of her oldest daughter in Palm Beach Gardens, Florida. As she looked to purchase a new home, Father solicited the services of Darrell Lowder, an accountant and financial planner, for advice on how to protect Grandmother's assets from relatives and future nursing home expenses. Lowder advised Father that any new assets purchased by Grandmother should be titled in Father's name. Father followed Lowder's advice, and when Grandmother purchased a home in Palm Beach Gardens (Florida residence), it was titled in Father's name. Although Grandmother paid the down payment on the residence and $300 a month towards the mortgage payment, the remainder of the $721.40 monthly mortgage payment was paid from the parties' joint bank account. For the two years in which Grandmother lived in the Florida residence, Mother and Father paid a total of $9,635 in mortgage payments and an additional $5,500 for repairs on the Florida residence.

In October 2002, Grandmother's daughter suffered a stroke. With no family members able to watch over her in Florida, Grandmother and Father decided it was in her best interests to sell the Florida residence and purchase a home in Sumter.

In November 2002, the Florida residence was sold for $138,500.[1] The proceeds from the sale were transferred to the parties' joint bank account. The following month, Grandmother purchased a home in Sumter for $110,000, titled in Father's name. Mother and Father paid $7,396 from their joint account for closing costs and other expenses associated with the Sumter residence. After these transactions were complete, Grandmother reimbursed Mother and Father for all expenses they had paid on her behalf: the mortgage payments on the Florida residence, repairs on the Florida residence, and closing costs and other expenses associated with the Sumter residence. Father accomplished this by deducting the unreimbursed expenses from the proceeds of the sale of the Florida residence, which remained in Mother and Father's joint account. Then, Father transferred the remaining proceeds from the sale of the Florida residence to a separate savings account for Grandmother. Thereafter, Father transferred $65,000 from Grandmother's savings account to the joint marital account so he could purchase tobacco bonds from Legg Mason for Grandmother. Ultimately, Father purchased $40,646 worth of tobacco bonds in his name for Grandmother and transferred the remaining $24,354 into Grandmother's savings account.

Although Mother and Father experienced some marital problems throughout the course of their marriage, they managed to resolve these issues, and their marriage remained intact. However, in September 2003, Father went to Hawaii on vacation without Mother and Kate to celebrate his brother-in-law's retirement from the fire department. Upon returning home to Sumter, the parties' marital troubles escalated, and they began attending counseling sessions. Unable to resolve their differences, Father moved in with Grandmother later that month. Ultimately, Mother discovered Father was having an extramarital affair with a flight attendant, Victoria Eckles. In addition, Mother learned Father had taken Victoria with him to Hawaii, and on a previous occasion, he had taken Kate to see a movie with Victoria.

---

1. The Florida residence was purchased by Grandmother in October 2000 for $102,000.

In October 2003, Mother commenced this divorce action against Father on the grounds of adultery. Additionally, Mother sought custody of Kate, child support, alimony, equitable division of the marital estate, and attorney's fees. In his answer, Father admitted the adultery and agreed Mother should have primary physical custody of Kate. In February 2004, the Honorable George M. McFaddin, Jr. issued a *Pendente Lite* Order, granting Mother physical custody of Kate and ordering Father pay $1,338 per month in child support, $2,500 per month in temporary maintenance, and $12,500 in attorney's fees. Thereafter, a three-day trial ensued with the focal point of the litigation dedicated to discerning whether the tobacco bonds and Sumter residence, titled in Father's name, were marital property subject to equitable division. On January 28, 2005, the family court issued a decree of divorce to Mother on the grounds of adultery and reserved all other issues. On May 31, 2005, the family court issued a supplemental final order, resolving all issues except for attorney's fees. In its supplemental order, the court awarded Mother custody of Kate and granted Father weekend visitation, including one non-overnight visitation from 6:00–7:30 p.m. when he did not have weekend visitation the following weekend. Additionally, the court ordered Father to pay Mother $821 per month in child support and $1,650 per month in alimony. The court also found the tobacco bonds and Sumter residence were not marital property and not subject to equitable division. Both parties filed motions to reconsider, which were denied. The family court ultimately issued an order denying both parties' requests for attorney's fees. Both parties appeal.

## STANDARD OF REVIEW

In an appeal from the family court, this court may correct errors of law and find facts in accordance with its own view of the preponderance of the evidence. *Semken v. Semken,* 379 S.C. 71, 75, 664 S.E.2d 493, 496 (Ct.App.2008). We are not, however, required to ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Marquez v. Caudill,* 376 S.C. 229, 239, 656 S.E.2d 737, 742 (2008).

## LAW/ANALYSIS

### I.  MOTHER'S APPEAL

A.  Private School Tuition

Mother contends the family court erred in refusing to deviate from the child support guidelines and include the cost of Kate's private school tuition in calculating child support.  In its order, the family court refused to deviate from the child support guidelines, finding such relief was not requested in Mother's pleadings or at trial.  On appeal, Mother argues the family court erred in failing to liberally construe her pleadings.  She asserts her request for "such other relief as the court may deem fit and proper" in her complaint and her testimony about the cost of Kate's private school tuition was sufficient to place the issue before the family court.  We agree.

Rule 12 of the Rules of Practice for the Family Courts of South Carolina governed the construction of pleadings in family court until it was repealed with the enactment of the South Carolina Rules of Family Court on September 1, 1988.  *See Ward v. Marturano,* 302 S.C. 112, 115, 394 S.E.2d 16, 18 (Ct.App.1990) (stating former Rule 12 required pleadings to be liberally construed); Rule 2(d), SCRFC ("All Rules of Practice for the Courts of this State heretofore adopted are repealed as of the effective date of the South Carolina Rules of Family Court.").  Currently, no family court rule governs the construction of pleadings.  As a result, Rule 8(f), SCRCP applies.  *See* Rule 81, SCRCP (stating The South Carolina Rules of Civil Procedure apply in family court when no family court rule provides otherwise).  Rule 8(f) requires courts to construe pleadings so "as to do substantial justice to all parties." "To ensure substantial justice to the parties, the pleadings must be liberally construed." *Gaskins v. S. Farm Bureau Cas. Ins. Co.,* 343 S.C. 666, 671, 541 S.E.2d 269, 271 (Ct.App. 2000), *aff'd as modified on other grounds,* 354 S.C. 416, 581 S.E.2d 169 (2003).

In *McMaster v. Strickland,* although the plaintiff captioned his action as one for "Breach of Contract," he failed to request monetary damages in his complaint.  Instead, the plaintiff asked only for specific performance and "such other or further

relief as the Court deems just and proper." 322 S.C. 451, 454, 472 S.E.2d 623, 625 (1996). Nonetheless, the special referee awarded plaintiff monetary damages. *Id.* On appeal, the defendant argued the special referee erred in awarding plaintiff relief not requested in his pleadings. *Id.* Our supreme court upheld the special referee's award of monetary damages because the factual allegations of the complaint supported such an award and because the complaint contained a prayer for general relief. *Id.* In reaching its conclusion, the supreme court relied heavily on *Mortgage Loan Co. v. Townsend,* 156 S.C. 203, 152 S.E. 878 (1930). In *Townsend,* the supreme court held "[i]f the facts alleged are broad enough to warrant relief, it matters not how narrow the specific prayer may be *if the bill contains a prayer for general relief."* *Id.* at 225, 152 S.E. at 886 (emphasis added).

In *Ward v. Marturano,* father commenced an action seeking a reduction in child support after learning daughter was entitled to social security benefits. 302 S.C. 112, 113, 394 S.E.2d 16, 17 (Ct.App.1990). In addition to granting father this relief, the family court also determined father was entitled to a credit for previous social security benefits received by daughter. *Id.* at 114, 394 S.E.2d at 17. On appeal, mother contended the family court erred in crediting father with all past social security payments received by daughter because father did not specifically request such relief in his pleadings. *Id.* at 115, 394 S.E.2d at 18. While this court found father did not specifically request credit for past payments, it affirmed the family court's decision because father's complaint contained a prayer for general relief and because the treatment of past paid benefits was at issue. *Id.*

■ Generally, the amount of child support which would result from the application of the child support guidelines is the amount of child support to be awarded. S.C.Code Ann. Regs. § 114–4710(A)(1) (Supp.2008). However, the Guidelines do not take into account the economic impact of private school tuition and specifically list the expenses incurred on private school tuition as a possible reason for deviation from the Guidelines. S.C.Code Ann. Regs. § 114–4710(B)(1) (Supp. 2008). While the family court maintains the discretion to decide whether to deviate from the child support guidelines in a given case, its decision must rest upon sound legal princi-

ples. *See Smith v. Doe,* 366 S.C. 469, 474, 623 S.E.2d 370, 372 (2005) ("Child support awards are within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion."); *McKnight v. McKnight,* 283 S.C. 540, 543, 324 S.E.2d 91, 93 (Ct.App.1984) (stating an abuse of discretion occurs when the family court's findings are without evidentiary support or a ruling is based upon an error of law.).

■ In our view, the family court erred in refusing to consider whether deviation from the child support guidelines was appropriate in this case. Contrary to the decision of the family court, Mother's pleadings and the evidence presented at trial sufficiently placed this issue before the court. Similar to *McMaster, Townsend,* and *Ward,* Mother did not specifically ask the family court to deviate from the child support guidelines in her complaint. Rather, in her complaint, Mother asserted she was entitled to receive child support as set forth by the guidelines and, in addition, prayed for "such other relief as the Court may deem appropriate." By claiming entitlement to child support based upon the guidelines and including a prayer for general relief, Mother's pleadings were sufficient for the family court to decide whether deviation from the child support guidelines was appropriate, if such evidence was introduced at trial. *See Townsend,* 156 S.C. at 225, 152 S.E. at 886 ("If the facts alleged are broad enough to warrant relief, it matters not how narrow the specific prayer may be if the bill contains a prayer for general relief.").

At trial, Mother testified at length about the fact Kate attended private school, the cost of her tuition, and her desire for Kate to continue attending school there. Additionally, Mother testified she and Father mutually decided to enroll Kate in private school. On cross examination of Father, Mother's attorney specifically asked Father, "[w]hat is your position in regards to the payment of the Wilson Hall tuition?" Simply put, a central issue at trial was whether Father would have to contribute towards Kate's private school tuition. *See Ward,* 302 S.C. at 115, 394 S.E.2d at 18 (determining the family court did not err in awarding relief not specifically requested in father's pleadings where his complaint contained a prayer for general relief, and the relief granted addressed a central issue at trial). Accordingly, the family court erred in refusing to consider this issue. As a result, we remand this

issue to the family court to consider whether deviation from the Guidelines is appropriate in this case.

B.   Life Insurance As Security For Alimony & Child Support

Mother argues the family court erred by not requiring Father to obtain life insurance as security for Father's alimony and child support obligations. Mother contends she demonstrated the need for such security in light of her age, health concerns, limited earning capacity, limited assets, and Father's dangerous occupation as a pilot. In addition, Mother asserts Father has the financial ability to acquire life insurance as evidenced by his earning capacity. We disagree.

The family court may order the payor spouse to obtain life insurance as security for an alimony or child support obligation if the supported spouse can demonstrate the existence of special circumstances with reference to her need for the security and the payor spouse's ability to provide it. *Wooten v. Wooten,* 364 S.C. 532, 553, 615 S.E.2d 98, 109 (2005); *see* S.C.Code Ann. § 20–3–130(D) (Supp.2008). In considering whether the supported spouse has demonstrated a need for such security, the family court should consider "the supported spouse's age, health, income earning ability, and accumulated assets." *Wooten,* 364 S.C. at 553, 615 S.E.2d at 109. If a need for security is found, the family court should then consider the payor spouse's ability to secure the award with life insurance by considering "the payor spouse's age, health, income earning ability, accumulated assets, insurability, cost of premiums, and insurance plans carried by the parties during the marriage." *Id.*

Mother has not demonstrated the existence of special circumstances giving rise to a need for security in this case. The record reveals Mother was forty-three-years-old at the time of trial. Although she had two benign breast biopsies in the past, Mother testified repeatedly at trial that she was in good health. Additionally, while Mother currently earns less than $30,000 annually for teaching at private school, her "income earning ability" is substantially higher. If Mother chose, she could earn close to $50,000 annually as a public

schoolteacher.[2]  Finally, Mother owns substantial assets as a result of the equitable division of the marital estate.  In its final order, the family court awarded Mother fifty percent of the marital assets, including the marital home, which the family court valued at $364,000.  While Father is in good health and can afford the insurance premiums, Mother failed to demonstrate the existence of special circumstances giving rise to a need for security.  Thus, the family court did not err in refusing to require Father to obtain life insurance as security for his child support and alimony obligations.

## C.  Mother's Medical Insurance & Expenses

Mother argues the family court erred by not requiring Father to continue to provide health insurance to her through his employer.  Alternatively, she contends the family court was required to consider the cost associated with obtaining health insurance on her own in awarding alimony.  In its order, the family court refused to address these issues, finding "Mother did not seek medical or health insurance coverage from Father in her pleadings or during her testimony, nor did Mother seek payment of her medical or health insurance expenses from Father."  We disagree with the findings of the family court.

"Alimony is a substitute for the support which is normally incident to the marital relationship."  *Johnson v. Johnson*, 296 S.C. 289, 300, 372 S.E.2d 107, 113 (Ct.App.1988).  "Generally, alimony should place the supported spouse, as nearly as practical, in the same position he or she enjoyed during the marriage."  *Allen v. Allen*, 347 S.C. 177, 184, 554 S.E.2d 421, 424 (Ct.App.2001).  The decision to grant or deny alimony rests within the sound discretion of the family court and will not be disturbed on appeal absent an abuse of discretion.  *Jenkins v. Jenkins*, 357 S.C. 354, 360, 592 S.E.2d 637, 640 (Ct.App.2004).  Section 20–3–130(C) of the South Carolina Code (Supp.2008) sets forth twelve factors which

---

**2.**  According to *Wooten,* courts must consider "the earning ability" of the supported spouse in assessing her need for life insurance as security for alimony and child support.  364 S.C. at 553, 615 S.E.2d at 109.  This is a separate inquiry from determining whether Mother is voluntarily underemployed and in no way shapes our analysis on that issue.

must be weighed when determining alimony. In deciding whether to award alimony, the family court must consider: (1) the duration of the marriage and the ages of the parties at the time of the marriage and at separation; (2) the physical and emotional condition of each spouse; (3) the educational background of each spouse and the need for additional education; (4) the employment history and earning potential of each spouse; (5) the standard of living established during the marriage; (6) the current and reasonably anticipated income of each spouse; (7) the current and reasonably anticipated expenses of each spouse; (8) the marital and nonmarital properties of the parties; (9) the custody of any children; (10) marital misconduct or fault; (11) the tax consequences of the award; (12) the existence of support obligations to a former spouse; and (13) such other factors the court considers relevant.

*Id.* The family court may weigh these factors as it deems appropriate. *Id.*

As an initial matter, the family court is mistaken in concluding Mother did not ask for medical or health insurance coverage from Father in her pleadings or at trial. In her pleadings, Mother asked for "coverage for Plaintiff and the minor child on Defendant's health and dental insurance." At trial, Mother, who had been covered under Father's health insurance plan during the parties' marriage, testified she wanted to continue with "the same type of coverage [she] had in the past." Although the family court erred in refusing to address the merits of this issue, there is nothing in the record to indicate that Father's insurance carrier would allow him to carry Mother on his health insurance plan after the parties' divorce became final. *See Germain v. Nichol,* 278 S.C. 508, 509, 299 S.E.2d 335, 335 (1983) (holding that the appealing party has the burden of providing a sufficient record). Accordingly, we cannot grant Mother any relief from this error.

The family court also erred by refusing to consider the cost associated with Mother obtaining health insurance on her own in awarding alimony. In her pleadings, Mother alleged she was entitled to alimony. Section 20–3–130(C) requires the family court to consider all of the twelve factors enumerated in that section when determining alimony. *Id.;*

*see Epperly v. Epperly,* 312 S.C. 411, 415, 440 S.E.2d 884, 886 (1994) (noting the statute "sets forth twelve factors which *must* be weighed when determining alimony.") (emphasis in original). Factor number seven requires the court to consider "the current and reasonably anticipated expenses and needs of both spouses." § 20-3-130(C). Thus, regardless of whether Mother asked the family court to consider the cost of obtaining health insurance in her pleadings, the family court was required to consider this expense in awarding alimony. At trial, Mother testified that health insurance through her employer would cost $189 a month. However, the family court refused to consider this expense because "[Mother] did not ask that such expenses be considered in the alimony calculation." This was error. As a result, we remand this issue to the family court to consider adjusting Mother's alimony award in light of this expense.

D. Equitable Division

Mother argues the tobacco bonds and Sumter residence were marital property subject to equitable division because they were purchased with marital funds. Alternatively, Mother asserts the tobacco bonds and Sumter residence, both titled in Father's name, were transmuted into marital property and subject to equitable division. We disagree.

Marital property is defined as all real and personal property acquired by the parties during marriage and owned as of the date of filing or commencement of marital litigation regardless of how title is held. S.C.Code Ann. § 20-3-630(A) (Supp. 2008). Section 20-3-630(A)(1)-(4) of the South Carolina Code (Supp.2008) contains four exceptions to this general rule. Thus, even if property fits within the statutory definition of marital property, the property is considered nonmarital if either party acquires the property by inheritance, devise, bequest, or gift from a party other than the spouse. § 20-3-630(A)(1). In addition, property acquired by either party in exchange for property acquired by inheritance, devise, bequest, or gift is nonmarital. § 20-3-630(A)(3); *see Jenkins v. Jenkins,* 345 S.C. 88, 100, 545 S.E.2d 531, 538 (Ct.App.2001) ("[P]roperty acquired during the marriage in exchange for nonmarital property is nonmarital.").

Property that is nonmarital at the time of its acquisition retains its separate identity unless it becomes transmuted into marital property. *Miller v. Miller,* 293 S.C. 69, 71, 358 S.E.2d 710, 711 (1987). Nonmarital property may be transmuted into marital property if: (1) it becomes so commingled with marital property to render it untraceable; (2) it is titled jointly; or (3) it is utilized by the parties in support of the marriage or in some manner evidencing an intent by the parties to make it marital property. *Johnson,* 296 S.C. at 295, 372 S.E.2d at 110. "Transmutation is a matter of intent to be gleaned from the facts of each case." *Jenkins,* 345 S.C. at 98, 545 S.E.2d at 537. "The spouse claiming transmutation must produce objective evidence showing that, during the marriage, the parties themselves regarded the property as the common property of the marriage." *Johnson,* 296 S.C. at 295, 372 S.E.2d at 110–11.

At trial, Grandmother testified that she gave Father the funds to purchase the tobacco bonds and Sumter residence from her personal savings account.[3] *See* § 20–3–630(A)(1) (stating property is considered nonmarital if either party acquires the property as a gift from a party other than the spouse). Father and Darrell Lowder, Father's accountant and financial planner, corroborated Grandmother's testimony. In addition, Father produced financial records, showing the money used to acquire these assets came from Grandmother's savings account. Because the parties were married when Father acquired title to the tobacco bonds and Sumter residence, the character of the funds used to purchase these assets determines whether the assets themselves should be considered marital or nonmarital property. *See* § 20–3–630(A)(3) (stating property acquired by either party in exchange for property acquired by a gift is nonmarital); *Jenkins,* 345 S.C. at 100, 545 S.E.2d at 538 ("[P]roperty acquired during the marriage in exchange for nonmarital property is nonmarital."). Thus, if the money found in Grandmother's savings account qualified as nonmarital property, the tobacco bonds and Sumter residence should also be characterized as nonmarital property.

---

3. While Grandmother failed to file a gift tax return evidencing her gift of these funds to Father, her failure to do so is not dispositive on the issue of whether a gift was actually given.

Father opened Grandmother's savings account after the sale of the Florida residence. While Grandmother lived in the Florida residence, Mother and Father paid $9,635 in mortgage payments and $5,500 for repairs on the house from their joint account. However, once the Florida residence was sold, the proceeds from the sale, $73,982.33, were transferred into Mother and Father's joint account. From these proceeds, Grandmother reimbursed Mother and Father for the mortgage payments and repairs. Additionally, Grandmother reimbursed Mother and Father for closing costs and other expenses they provided for the Sumter residence.[4] This was accomplished by Father deducting these unreimbursed expenses from the proceeds of the sale of the Florida residence, which remained in Mother and Father's joint account. Then, Father transferred the remaining proceeds from the sale of the Florida residence to Grandmother's newly opened savings account. Thus, all marital funds spent on the Florida residence were fully reimbursed to Mother and Father with the sale of the Florida residence. Additionally, all remaining proceeds from the sale of the Florida residence were used to create Grandmother's savings account. Because all marital funds spent on the Florida residence were reimbursed, Grandmother's savings account qualified as nonmarital property. From Grandmother's savings account, the tobacco bonds and Sumter residence were purchased. As a result, these assets were also nonmarital property and not subject to equitable division, unless they became transmuted into marital property. *See* § 20–3–630(A)(3) (stating property acquired by either party in exchange for property acquired by a gift is nonmarital); *Miller*, 293 S.C. at 71, 358 S.E.2d at 711 ("Property that is nonmarital at the time of its acquisition retains its separate identity unless it is transmuted into marital property.").

Because Mother claims the tobacco bonds and Sumter residence were transmuted into marital property, she bears the burden of "produc[ing] objective evidence showing that, during the marriage, the parties themselves regarded the property as the common property of the marriage." *Johnson*, 296 S.C. at 295, 372 S.E.2d at 111. She has not carried this

---

4. Mother and Father paid $7,396 from their joint account for closing costs and other expenses associated with the recent purchase of the Sumter residence.

burden. At trial, no testimony was introduced evidencing an intent for these assets to become marital property. Instead, Father, Grandmother, and Darrell Lowder all testified the tobacco bonds and Sumter residence were titled in Father's name for the purpose of protecting these assets from Grandmother's relatives and future nursing home expenses. While Mother and Father claimed they owned the tobacco bonds and Sumter residence on their tax returns, they only did so in accordance with the advice of Lowder.[5] Because the record does not reveal that the parties regarded the tobacco bonds or Sumter residence as marital property during their marriage, the family court did not err in concluding these assets retained their character as nonmarital property. Accordingly, we affirm the family court's ruling.

### E.  Attorney's Fees & Costs

Mother argues the family court erred by failing to award her attorney's fees and costs. We remand this issue to the family court for further consideration.

"The award of attorney's fees is left to the discretion of the trial judge and will only be disturbed upon a showing of abuse of discretion." *Upchurch v. Upchurch*, 367 S.C. 16, 28, 624 S.E.2d 643, 648 (2006). In awarding attorney's fees, the court should consider each party's ability to pay his or her own fee, the beneficial results obtained by the attorney, the parties' respective financial conditions, and the effect of the fee on each party's standard of living. *E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). In determining the amount of attorney's fees to award, the court should also consider the: (1) nature, extent, and difficulty of the case; (2) time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; (6) customary legal fees for similar services. *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

We have already concluded that the family court erred in refusing to address the cost of Kate's private school tuition and the cost of Mother's medical expenses. On remand, it is

---

**5.** At trial, Lowder testified the parties did not receive a tax advantage or detriment as a result of listing these assets on their return.

possible the family court may decide these issues in Mother's favor. If they are decided in Mother's favor, this result could alter the court's analysis of the "beneficial results obtained at trial." Accordingly, any determination of whether to award attorney's fees must wait until these issues are revisited by the family court. Thus, this issue is remanded to the family court.

## II. FATHER'S APPEAL

### A. Voluntary Underemployment

Father argues the family court erred in failing to impute income to Mother because she could earn a higher salary teaching in public schools. We disagree.

"The failure to reach earning capacity, by itself, does not automatically equate to voluntary underemployment such that income must be imputed." *Gartside v. Gartside*, 383 S.C. 35, 44, 677 S.E.2d 621, 626 (Ct.App.2009). "[T]he common thread in cases where actual income versus earning capacity is at issue is that courts are to closely examine the payor's good-faith and reasonable explanation for the decreased income." *Kelley v. Kelley*, 324 S.C. 481, 489, 477 S.E.2d 727, 731 (Ct.App.1996). However, a parent seeking to impute income to the other parent need not establish a bad faith motivation to prove underemployment. *Arnal v. Arnal*, 371 S.C. 10, 13, 636 S.E.2d 864, 866 (2006).

The family court did not err in refusing to impute income to Mother. For most of the parties' marriage, Mother taught in public schools. In fact, Mother did not quit working in public schools until the parties adopted Kate in 2001. After adopting Kate, Mother and Father mutually agreed she would no longer teach in the public school system so she could spend more time at home with Kate. Thereafter, Mother began working at Wilson Hall. Because Mother's decision to quit working at public school was the product of a mutual decision made during the parties' marriage, the family court did not err in refusing to impute income to Mother.

### B. Visitation

Father asserts the family court erred in the manner in which it awarded visitation. Specifically, Father claims the family court erred by not awarding him more flexible weekend visitation and overnight visitation on weekdays. Additionally, he argues the family court erred in: allowing Mother to deny visitation for "good cause"; requiring the parties to exchange Kate on Christmas Day; limiting telephone contact with the child to three days a week for no more than twenty minutes at a time; not stating whether Kate was barred from international travel; not requiring Kate to obtain a passport to facilitate international travel; and not allowing Kate to fly unaccompanied when she reaches the age permitted by the airlines. We disagree.

The welfare and best interests of the child are the primary considerations in determining visitation. *Paparella v. Paparella*, 340 S.C. 186, 191, 531 S.E.2d 297, 300 (Ct.App. 2000). The family court has the discretion to place limitations on visitation. *Nash v. Byrd*, 298 S.C. 530, 536, 381 S.E.2d 913, 916 (Ct.App.1989). In the absence of a clear abuse of discretion, the family court's order limiting visitation rights will not be disturbed on appeal. *Id.*

The family court did not err in setting the visitation schedule. As an initial matter, the family court provided Father with a flexible visitation schedule. Father's work schedule varies from month-to-month, and he does not receive notice of his schedule for the upcoming month until the end of the current month. Because of this, the family court allowed Father to advise Mother of his schedule when he received it. After consulting his work schedule, Father could request visitation with Kate during the upcoming month. Obviously, this flexible visitation schedule requires the parties to work together to facilitate Father's visitation. Recognizing this, the family court admonished Mother that she should not "without good and just cause, deny Father's requests." Therefore, contrary to Father's assertion in his brief, the family court did not leave Father's regular visitation to the whim of Mother. Rather, the family court, in making this statement, was urging the parties to work together so as to accommodate Father's unpredictable schedule. On appeal, Father has failed to point

to any evidence in the record indicating that Mother has arbitrarily or "without good and just cause" denied Father's visitation requests. As for Father's remaining arguments, there is no evidence demonstrating that the family court abused its discretion in resolving these issues.[6]

Based on the foregoing, the family court's decision is

**AFFIRMED IN PART, REVERSED IN PART, and RE-MANDED.**

HUFF, J., and LOCKEMY, J., concur.

---

6. The family court did not rule on the following issues at trial: whether Kate was barred from international travel and whether Kate must obtain a passport to facilitate international travel. While these issues were raised at trial, the family court did not rule on them, and Father did not ask the family court to consider these issues in his Rule 59 motion. Accordingly, these issues are not preserved for appeal. *See Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 24, 602 S.E.2d 772, 780 (2004) (stating a party must file a Rule 59(e) motion when an issue or argument has been raised, but not ruled on, in order to preserve it for appellate review). Additionally, Father never put forth any evidence at trial as to the age at which airlines allow children to fly unaccompanied. This issue is likewise unpreserved for appeal.