596 S.E.2d 908

Marcus R. DURLACH, III, Appellant,

v.

Sherry T. DURLACH and Daniel O. Legare
as Sequestrator, Respondents.

No. 25823.

Supreme Court of South Carolina.

Heard Feb. 18, 2004.
Decided May 17, 2004.

66

Michael A. Molony and Lea B. Kerrison, both of Young, Clement, Rivers & Tisdale, of Charleston, for Appellant.

Jack D. Cordray, of Cordray Law Firm, of Charleston, and Samuel H. Altman, of Derfner, Altman, & Wilborn, of Charleston, for Respondents.

Chief Justice TOAL:

Marcus R. Durlach, III (Husband) appeals the family court order holding him in civil contempt, sentencing him to serve

not more than six months in jail, suspended on payment of $292,953.86. We affirm the contempt order but reduce the amount owed to $248,890.26, finding that the family court erred in awarding pre-judgment interest.

### FACTUAL/PROCEDURAL BACKGROUND

On March 1, 1996, Husband filed for divorce from Respondent Sherry T. Durlach (Wife). Wife counterclaimed and was granted a divorce on grounds of physical cruelty by order dated April 16, 1998. The parties have engaged in legal battles concerning the marital property ever since.

Upon divorce, the marital property was divided equally. Among other things, Wife was awarded King at Market LP (KAM), a business formed during the marriage of which Wife was an original limited partner. KAM's business purpose is the ownership and management of historic buildings located in the heart of Charleston's retail and hospitality district. A retail clothing and accessories business incorporated by Wife three and a half years before the marriage is located in one of the buildings.

According to the April 16, 1998 divorce decree, KAM was to be transferred to Wife effective December 10, 1997, the last day of trial. The transfer was to include, "all current assets, records, cash, receivables, prepayments, deposits, rents and all other assets," including any management agreements with KAM held by Husband. The decree also provided that "[a]ny arrearage, discrepancy, damage (including damages to or changes in the assets), debt, or other charge on the [KAM] partnership or its assets shall be subject to review by this Court. . . ." Finally, the decree specified that "the outstanding loan to Wachovia Bank in the amount of $892,500 is secured by the Husband's interest in Parkshore" and therefore "Husband shall also be responsible for that debt."

Husband appealed several provisions of the divorce decree.[1] During the time the appeal was pending, Husband and Wife entered into a consent order (the Parkshore[2] Order) dated

---

1. In an unpublished opinion, the Court of Appeals affirmed the divorce decree in all material respects.

2. Parkshore Centre I L.P. (Parkshore) was a business formed by Husband for the purpose of acquiring and developing property. Husband's

October 15, 1998, which was approved by the Charleston County Family Court. The primary purpose of the Parkshore Order was to give Husband the authority to re-finance a piece of marital property "to preserve the marital estate." In addition, the Parkshore Order provided the following:

a. [Husband] continues to manage [KAM], but makes Wachovia payments separately from his other funds. Only ordinary, normal, reasonable expenses shall be paid from the [KAM] account and all other [KAM] funds shall be kept in the [KAM] account.

. . .

c. All issues concerning management, oversight and control of marital property pending resolution of the various appeals shall be in the jurisdiction of the Family Court, with hearing only after meaningful mediation efforts. These issues are designated herein by the parties as local issues.

The Parkshore Order also gave Wife the authority to hire an agent to oversee the KAM accounts and management.

Approximately six months later, Wife contended that Husband had mismanaged KAM affairs. In response to Wife's claims, the family court judge appointed a sequestrator (Legare) to manage and control KAM in every respect. The appointment was prompted after the court discovered canceled checks drawn on the KAM account for payment of the Wachovia debt,[3] which directly contradicted the terms of the divorce decree and the Parkshore Order. The judge also found that there was an improper accounting of the KAM funds and "enjoined and restrained [Husband] from making any withdrawals or disbursements from the accounts of [KAM]." Accordingly, in addition to managing KAM, Legare was directed to investigate whether KAM assets had been mismanaged.

In his investigation, Legare found that Husband diverted funds from KAM totaling $160,100.83. Subsequently, Wife

---

partnership interest in Parkshore was deemed marital property for purposes of equitable distribution.

**3.** The Wachovia loan was primarily secured by Husband's interest in Parkshore. The court found that Husband was responsible for paying this debt.

and Legare petitioned the court for a rule to show cause, seeking reimbursement of the funds Husband diverted (plus pre-judgment interest, Legare's fees, and Legare's attorney's fees), and requesting that Husband be held in contempt for violating court orders. Husband filed a return and counter-claimed.

After a hearing on December 6, 2001, the court found Husband in contempt, sentencing him to serve not more than six months in jail, suspended on payment of $292,953.86, which represents the amount of KAM funds diverted, pre-judgment interest, and fees owed to Legare and his attorney. Husband raises the following issues on appeal:

I.   Did the family court properly hold Husband in contempt?

II.  Did the family court properly order Husband to pay pre-judgment interest?

III. Was Husband denied due process?

## LAW/ANALYSIS

### STANDARD OF REVIEW

■ . When reviewing the factual findings of the family court, this Court may take its own view of the preponderance of the evidence. *Woodall v. Woodall,* 322 S.C. 7, 10, 471 S.E.2d 154, 157 (1996). But if the evidence is in dispute, the appellate court should give the trial judges findings broad deference. *Id.*

■ More specifically, this Court should reverse a decision regarding contempt "only if it is without evidentiary support or the trial judge has abused his discretion." *Stone v. Reddix–Smalls,* 295 S.C. 514, 516, 369 S.E.2d 840 (1988); *see also Henderson v. Henderson,* 298 S.C. 190, 197, 379 S.E.2d 125, 129 (1989) ("A finding of contempt rests within the sound discretion of the trial judge.").

## I.   CIVIL CONTEMPT

Husband argues that the family court erred by holding him in contempt. We disagree.

Courts have the inherent power to punish for contempt. *In re Brown*, 333 S.C. 414, 420, 511 S.E.2d 351, 355 (1998). Willful disobedience of a court order may result in contempt. *In re Brown*, 333 S.C. at 420, 511 S.E.2d at 355. A willful act is one done voluntarily and intentionally, with the specific intent of doing something the law forbids. *Id.*

Civil contempt must be proved by clear and convincing evidence. *Poston v. Poston*, 331 S.C. 106, 113, 502 S.E.2d 86, 89 (1998) (citation omitted). "The purpose of civil contempt is to 'coerce the defendant to do the thing required by the order for the benefit of the complainant.'" *Id.* at 111, 502 S.E.2d at 88.

In the present case, the family court judge held Husband in contempt for the following: (1) using KAM funds to make payments on the Wachovia debt in 1998 and 1999 in the amount of $140,040.41; (2) writing checks from KAM funds to his attorney in the amounts of $4069 and $1900; (3) paying the Commissioner of Public Works $148.67 from KAM funds for another, non-KAM property; (4) failing to pay KAM $69,383 in unpaid rent and late charges for Durlach Associates office space; (5) bartering rent with Louis's Restaurant, providing space at KAM in return for a food-and-beverage credit of $350 per month, owing KAM $9,800; (6) bartering rent at KAM for legal services related to the divorce, owing KAM $11,980; (7) bartering advertising with Charleston Business Journal, owing KAM $7,000; and (8) paying himself commissions from the KAM account in the amount of $15,879.32.

In sum, the judge found that Husband "made repeated payments of the funds of KAM for obligations of his own or obligations of other entities. He willfully and knowingly violated the requirements of the orders of this court." Based on these findings, Husband was ordered to pay $292,953.86, representing the amount of misused KAM funds, pre-judgment interest, and professional fees for Legare and his attorney.

On appeal, Husband does not dispute that he made the payments and agreements delineated in the contempt order. Instead, he contends that his actions did not violate court orders. We disagree.

The following orders and their relevant mandates were effective throughout this litigation:

(1) *August 19, 1996 Supplemental Order:* "Both parties are enjoined and restrained from in any manner mortgaging, selling, secreting, pledging, encumbering, destroying, damaging, giving away, or in any other manner disposing of any real or personal property marital of the parties, pending the final hearing on the merits."

(2) *September 11, 1997 Ex Parte Restraining Order:* "[Husband] or any other entity or institution holding martial property is hereby enjoined and restrained from in any manner mortgaging, selling, secreting, pledging, encumbering, destroying, damaging, giving away, or in any other manner disposing of any real or personal marital property of the parties, pending the final hearing on the merits."

(3) *September 24, 1997 Pre-trial Order:* "[P]rior to the initiation of any transaction involving the buying, selling, refinancing or leasing of real property by [Husband] of any of [Husband's] entities, the terms of the said transaction shall be fully disclosed to [Wife] and the proposed transaction shall require her consent."

(4) *April 16, 1998 Final Order, Decree of Divorce, and Judgment:* "Because the outstanding loan to Wachovia Bank ... is secured by the Husband's interest in Parkshore, Husband shall be responsible for that debt." The order also transfers KAM to Wife effective December 10, 1997.

(5) *October 15, 1998 Consent Order as to Parkshore Refinancing:* States that "[Husband] continues to manage [KAM] but makes Wachovia payments separately from his other funds."

First, Husband violated the divorce decree and the Parkshore Order when he used KAM funds to make payments on the Wachovia debt in 1998 and 1999. The April 16, 1998 divorce decree specifically stated that Husband was personally responsible for the Wachovia debt. This responsibility was reiterated in the October 15, 1998 Parkshore Order. Therefore, payment of the Wachovia debt with KAM funds violated both the divorce decree and the Parkshore Order.

Second, Husband violated court orders when he bartered free rental space at KAM properties in exchange for food-and beverage credits, legal services, and advertising services. Such activity benefited Husband alone and diminished the value of KAM. Agreements entered into before the divorce decree violated pre-trial restraining orders, and those entered into afterward violated the divorce decree itself.

Third, Husband violated the divorce decree when he paid himself commissions from KAM funds between May 1998 and February 1999. The divorce decree terminated all management and leasing agreements held by Husband and transferred those agreements, and commissions associated with those agreements, to Wife. In addition, Husband violated the divorce decree when he used KAM funds to pay his own legal fees. The receipt of commissions and the payment of legal fees from KAM funds violated the divorce decree.

Fourth, Husband violated pre-trial restraining orders and the divorce decree when he failed to pay overdue rent to KAM on office space for Durlach Associates. Delinquency prior to the date KAM was transferred to Wife diminished the value of KAM in direct violation of the pre-trial restraining orders. Delinquency after the date KAM was transferred to Wife violated the divorce decree itself.

Again, Husband does not deny that he engaged in the activity outlined above. He contends, instead, that he did not violate court orders by managing KAM as he did. Nonetheless, Husband would, at times, reimburse KAM when he discovered that he "inadvertently" drew from KAM funds. We find that these reimbursements signified Husband's awareness that his conduct was contrary to court orders. By willfully disobeying court orders on multiple occasions, Husband provided the family court with clear and convincing evidence upon which to base its decision. Accordingly, we hold that Husband was properly held in contempt.

In addition to challenging the family court's findings regarding the misuse of KAM funds, Husband raises various challenges concerning other findings in the order and events leading up to its issuance. First, Husband argues that the family court judge erred in requiring him to pay a majority of Legare's and Legare's attorney's fees. Although the June 8,

1999 order for sequestration provided that Legare would be paid by KAM, we believe that this provision did not anticipate the extent of Husband's inappropriate use of funds and Husband's failure to cooperate with Legare. Therefore, we find that it was within the judge's discretionary authority to order Husband to pay a majority of the fees.

Second, Husband argues that the family court judge should have permitted the parties to mediate their dispute before proceeding with a hearing. We find that it was within the judge's discretion to conduct a hearing concerning Legare's report (and subsequently issue the contempt order) without first requiring that the parties engage in mediation. The Parkshore Order provisions concerning mediation applied during the period pending the appeal, which ended November 8, 2000, one year before the hearing took place. Consequently, it was within the judge's discretion to proceed with the hearing accordingly.

Third, Husband argues that his management activities at KAM before Legare was appointed as sequestrator should be deemed "valid" since the original sequestrator did not object or otherwise contest Husband's activities during that time. We disagree. The original sequestrator's lack of objection does not necessarily mean that Husband managed KAM in accordance with court orders. In addition, we find that (1) there is no evidence that the original sequestrator even conducted an investigation, and (2) Legare replaced the original sequestrator and became the sequestrator for all purposes, including for purposes of investigating questions of mismanagement of assets.

Fourth, Husband argues that Legare should not have considered transactions occurring before December 10, 1997, the date KAM was effectively transferred to Wife. We disagree. In his investigation, Legare reviewed activity dating as far back as September 1997, the date of the ex parte restraining order issued against Husband, which was appropriate given that this order controlled Husband's activities.

For the foregoing reasons, we hold that the family court properly held Husband in contempt.

## II. AWARD OF PRE-JUDGMENT INTEREST

■■■ Husband argues that the family court erred by ordering him to pay pre-judgment interest. We agree.

■■■ Parties must plead for pre-judgment interest in order for it to be recovered. *Calhoun v. Calhoun,* 339 S.C. 96, 103, 529 S.E.2d 14, 17 (2000). When such a plea is made, pre-judgment interest may be recovered "on obligations to pay money from the time when, either by agreement of the parties or operation of law, the payment is demandable, if the sum is certain or capable of being reduced to certainty." *Tilley v. Pacesetter Corp.,* 355 S.C. 361, 375, 585 S.E.2d 292, 299 (2003); *see also* S.C.Code Ann. 34–31–20(A) (2003) (authorizing pre-judgment interest at a rate of 8.75 percent per year "in all cases wherein any sum or sums of money shall be ascertained and due").

In the present case, we find that Wife and Legare pled for pre-judgment interest in their petition in support of rule to show cause. Additionally, the court, relying on Legare's comprehensive report, was able to arrive at a sum certain that was due KAM. The sum certain represented the amount of money Husband had used in violation of pre-trial restraining orders, the divorce decree, and the Parkshore Order.

But because the money due under the contempt order was not part of the judgment in this case, we hold that Wife and Legare are not entitled to pre-judgment interest. The divorce decree represents the judgment in this case, and there is no allegation that money due under the decree was not paid or divided as ordered or agreed to by the parties. The contempt order was issued not because Husband failed to abide by the distribution of funds and property in accordance with the divorce decree but because Husband *misused* funds in violation of various court orders, including the decree itself.

The purpose of the contempt order was to coerce Husband to reimburse money spent in a manner not approved by the court. As a coercive device, the contempt order is more like a citation than a judgment. Consequently, the sums due under the contempt order are not subject to interest as are money judgments. For these reasons, Wife and Legare are not entitled to pre-judgment interest on money due under the contempt order.

### III. DUE PROCESS

Finally, Husband argues that he was denied due process because the family court did not conduct a "separate and distinct" hearing to "certify" Legare's report. Further, Husband contends he was denied notice of the sequestrator's claims and the opportunity to object. We disagree.

"A due process claim raised for the first time on appeal is not preserved." *Bakala v. Bakala*, 352 S.C. 612, 625, 576 S.E.2d 156, 163 (2003).

Husband's due process claim was not raised in the family court and is raised for the first time here. Therefore, this issue is not preserved for review.

### CONCLUSION

Based on the foregoing analysis, we affirm the family court order finding Husband in contempt. But we modify the contempt order in one respect: Husband is not required to pay $44,063.60 in pre-judgment interest. Therefore, Husband owes KAM $248,890.26, representing the amount of funds diverted from KAM and fees for Legare and his attorney.

MOORE, WALLER, PLEICONES, JJ., and Acting Justice J.C. NICHOLSON, Jr., concur.