MCDONALD, J.:
**55 In this marital litigation, Lori Dandridge Stoney (Wife) separately appealed two family court orders. Upon our initial consideration of Wife's consolidated appeals, we reversed several findings of the family court and remanded for a new trial. Stoney v. Stoney , 417 S.C. 345, 790 S.E.2d 31 (Ct. App. 2016). Richard S.W. Stoney Sr. (Husband) and Theodore D. Stoney **56 Jr. (Brother) each petitioned for a writ of certiorari. Our supreme court granted the writs, dispensed with further briefing, reversed, and remanded the case to this court "to decide the appeal applying the appropriate standard of de novo review articulated in Lewis v. Lewis , 392 S.C. 381, 709 S.E.2d 650 (2011)." Stoney v. Stoney , 422 S.C. 593, 813 S.E.2d 486 (2018).[1] We reverse and remand to the family court for proceedings consistent with this opinion.
FACTUAL BACKGROUND
On October 12, 1996, Husband and Wife married in Berkeley County. Prior to the marriage, the parties entered into a prenuptial agreement.[2] The parties have one child together (Child).[3]
At the beginning of the marriage, Husband and Wife practiced law together; however, Wife began her own practice in 1997. Around this time, the parties opened a restaurant called the Boathouse at Breach Inlet (BHBI)[4] on the Isle of Palms, and Husband eventually stopped practicing law to focus on the restaurant. Wife's practice of law also became subordinate to the family's needs and operation of the parties' business ventures.[5]
**57 BHBI was very successful from the time it opened, and it became the source from which Husband financed his other ventures. Husband purchased four other restaurants and various businesses during the course of the marriage, making "loans" from BHBI to the new entities. These businesses were managed by Husband's company, Crew Carolina.
The couple's second restaurant was the Boathouse at East Bay Street (BHEB) in downtown Charleston. Although BHEB broke even, Husband closed the restaurant in January 2009. As of December 31, 2008, BHEB had a net asset value of negative $141,048. Husband and Brother jointly owned the real property on which BHEB was located.[6]
In 2003, the couple opened the Boathouse at Lake Julian (BHLJ) in Asheville, North Carolina, which closed in July 2008. As of December 31, 2008, BHLJ had a net asset value of negative $1,297,939, which included *207 an allocation of $474,792.78 of a Carolina First/DI Carolinas consolidation loan. In 2004, the couple purchased Carolinas, an existing restaurant located on Exchange Street in downtown Charleston, which they subsequently renovated. As of December 31, 2008, Carolinas had a net asset value of $89,539. Husband sold Carolinas[7] in January 2010 for over $550,000.[8] Additionally, Husband advanced funds and assisted a third-party with opening Choto, a restaurant in Knoxville, Tennessee.[9] **58 In February of 2009, the parties opened their final restaurant, the Boathouse at Ellis Creek (BHEC), which burned to the ground one month later. Husband received over $850,000 in insurance proceeds during the first year the parties were separated; however, he did not use this money to rebuild the restaurant.[10] Instead, these funds were used to satisfy obligations to other creditors and business partners. This account was drained by the time of trial. In his testimony, Husband explained, "every dime that I received for Ellis Creek was used to offset the massive amount of debt we had, and I believe that the forensic accountants have well covered that fact. ... I am doing everything I can to rebuild Ellis Creek." Throughout the trial, Husband referred to "robbing Peter to pay Paul" to keep creditors at bay and allow certain businesses to continue operating.
Husband started three additional businesses shortly after Wife filed for divorce: Amen Street Fish & Raw Bar, J & S Fish, LLC, and Rice Market.
PROCEDURAL BACKGROUND
On April 23, 2009, Wife filed an action for divorce seeking sole custody of Child, child support, alimony, equitable division, and other relief. By consent order dated May 15, 2009, the family court approved a change of venue from Charleston County to Orangeburg County. That same day, the family court approved a consent order sealing the record.
On June 18, 2009, Husband filed an answer and counterclaim, seeking joint custody of Child, enforcement of a prenuptial agreement, equitable division of the marital property and debt, and certain other relief. In addition, Husband sought the imputation of income to Wife and to pay reasonable child support pursuant to the South Carolina Child Support Guidelines.
On July 10, 2009, Wife filed a reply and counterclaim, admitting she had signed a prenuptial agreement, but alleging it had been lost. On this same date, the Honorable Anne Gue Jones entered a temporary order. This temporary order adopted an agreement titled, "Consent Order Regarding Certain Child Issues," which, among other things, awarded custody **59 to Wife and prohibited Husband from exposing Child to his paramours. The other issues raised remained contested. The court granted Wife exclusive use and possession of the couple's condominium in Charleston, and required Husband to pay Wife approximately $22,000 per month for Wife and Child's expenses. On February 26, 2010, a supplemental temporary order was issued, relieving Husband of certain obligations required by the July 10, 2009 temporary order.
On January 5, 2010, Brother filed a motion to intervene to protect his interests in certain real property, business concerns, and debts he asserts he is owed. The court granted Brother's motion to intervene by order dated *208 February 22, 2010, finding "[Brother]'s interest in this action outweighs any privacy interest that [Wife] asserts. ... [T]he interests of [Brother] and the property which is the subject of this action cannot be adequately protected because of the [Husband]'s tenuous financial condition."
On March 4, 2010, Brother filed a third-party complaint, requesting, among other things, a determination by the court that his loans to Husband (and to the parties on behalf of Husband) constituted marital debt. Husband answered Brother's complaint on March 4, 2010, admitting all of Brother's claims and joining in the relief sought by Brother. Wife answered on March 29, 2010, asserting she had insufficient information to admit or deny the allegations. On August 2, 2010, the family court issued a consent order relieving Husband's counsel. From this point through the two-week trial, Husband acted pro se.
During the pendency of this action, Husband was held in willful contempt with regard to four petitions and one supplemental petition for rules to show cause, and an additional rule remains unresolved. Specifically, Wife initially filed two petitions for rules to show cause (Rule 1 and Rule 2a), and a supplemental petition (Rule 2b). Rule 1, Rule 2a, and Rule 2b were resolved by order dated February 25, 2010, in which the family court found Husband in willful contempt for failing "to make payments under the Temporary Order, while he had funds to pay for other personal expenses on his behalf."
Wife filed a third rule to show cause (Rule 3) against Husband on January 11, 2010, regarding a criminal domestic **60 violence situation involving Brother and Husband that resulted in physical injury to Wife in Child's presence. On March 29, 2010, the family court found Husband to be in willful contempt. Additionally, the court required counseling for Husband and Child, appointed a parenting coordinator, and authorized Wife to tape her phone conversations with Husband.
Wife filed two additional petitions for rules to show cause (Rule 4 and Rule 5). In Rule 4, issued on June 29, 2010, Wife alleged that Husband failed to pay her regime fees, Wife and Child's uncovered medical/dental expenses, Child's private school expenses, and certain credit card obligations. In Rule 5, issued on October 8, 2010, Wife alleged Husband exposed Child to his paramour in violation of a specific restraining order.[11] Both Rule 4 and Rule 5 were resolved by order dated January 6, 2011, in which the family court again held Husband in willful contempt. Husband was sentenced to ninety days, suspended upon payment of the required expenses mentioned above, as well as a payment of $3,000 in attorney's fees to Wife's counsel.
Several motions, including Husband's January 25, 2011 motion to declare the contempt purged, were resolved by order dated March 24, 2011. In the March 24th order, the family court accepted Wife's agreement that Husband could purge his contempt sentence, based upon his assertion that he had made arrangements for support payments, as well as Husband's payment of the $3,000 in attorney's fees previously ordered. In that same order, the court denied Husband's motion to sell or pledge up to ten percent of his interest in BHBI as well as Wife's motion to either purchase BHBI or be awarded complete control over the day-to-day operations of the business. In a separate order, the family court required Husband and Wife to each contribute $5,000 toward a joint court-appointed CPA by March 25, 2011.
The two-week trial was held March 28-April 1, 2011, and May 23-27, 2011. When the trial started, Wife had complied with her $5,000 obligation to the CPA, but Husband had not. Wife filed another rule to show cause petition (Rule 6) on May **61 10, 2011, alleging Husband had failed to pay the previously ordered CPA fees and attorney's fees.[12] Despite Wife's requests, these contempt issues were never resolved. On June 17, 2011, after the trial concluded, but before the final *209 order was issued, Wife filed a motion to reopen the case based on newly discovered evidence.
On July 18, 2011, the family court entered an interim order, addressing the divorce only. Despite Wife's request for a divorce on the ground of adultery, the court granted dissolution on the ground of one year's continuous separation. On September 22, 2011, Wife moved to alter or amend the interim order pursuant to Rules 52, 59, and 60, SCRCP, and Rule 2(a), SCRFC. The family court denied this motion by order dated October 15, 2011. Wife appealed on November 18, 2011.
On July 25, 2011, the family court emailed counsel for Brother, requesting that he submit two proposed orders to the court: one order denying Wife's motion to reopen and another setting out the trial court's final order in the case on all remaining issues. Instead, Brother's counsel drafted a single order (Final Order), incorporating both the family court's denial of Wife's motion to reopen as well as its rulings on the remaining property and support issues.
Upon receipt of the Final Order, Wife's counsel emailed and wrote the family court and opposing counsel, requesting an opportunity to respond to Brother's proposed order. However, the family court ignored this request, made no revisions to Brother's submitted proposed order, and issued its Final Order on September 6, 2011.
On September 22, 2011, Wife timely filed a motion to alter or amend the Final Order, which the family court denied by order dated November 30, 2011. Wife appealed the Final Order on January 6, 2012. The two appeals were subsequently consolidated.
Wife contends the family court erred in (1) permitting Brother to intervene or, in the alternative, failing to control the extent of Brother's intervention; (2) denying Wife's motion to reopen on the basis of newly discovered evidence; (3) imputing income of only $100,000 per year to Husband; (4)
**62 failing to award Wife alimony; (5) failing to make a proper child support determination; (6) failing to require that Husband maintain life insurance/other security; (7) erroneously apportioning the marital property in several respects; (8) failing to find Wife has a special equity in certain businesses; (9) declining to hold Husband in contempt; (10) failing to grant Wife a divorce on the ground of adultery; and (11) failing to award Wife attorney's fees.
STANDARD OF REVIEW
"The family court is a court of equity." Lewis v. Lewis , 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). In appeals from the family court, the appellate court reviews factual and legal issues de novo. Simmons v. Simmons , 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). "De novo review permits appellate court fact-finding, notwithstanding the presence of evidence supporting the trial court's findings." Lewis , 392 S.C. at 390, 709 S.E.2d at 654-55 (emphasis omitted). "However, this broad scope of review does not require an appellate court to disregard the factual findings below or ignore the fact that the trial judge is in the better position to assess the credibility of the witnesses." Pinckney v. Warren , 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001). "Moreover, the appellant is not relieved of his burden of convincing the appellate court the trial judge committed error in his findings." Id . at 387-88, 544 S.E.2d at 623. Accordingly, we will affirm the decision of the family court unless its decision is controlled by some error of law or the appellant satisfies the burden of showing the preponderance of the evidence actually supports contrary factual findings by this court. See Lewis , 392 S.C. at 389-90, 709 S.E.2d at 654-55. However,
Lewis did not address the standard for reviewing a family court's evidentiary or procedural rulings, which we review using an abuse of discretion standard. See, e.g. , Broom v. Jennifer J. , 403 S.C. 96, 115, 742 S.E.2d 382, 391 (2013) (stating on appeal from the family court "the admission or exclusion of evidence is within the trial judge's discretion" (citing Fields v. Reg'l Med. Cent. Orangeburg , 363 S.C. 19, 25-26, 609 S.E.2d 506, 509 (2005) ) ); Gov't Employee's Ins. Co., Ex parte , 373 S.C. 132, 135, 644 S.E.2d 699, 701 (2007) (stating on appeal from the family court, "The decision to grant or deny a motion to join an action *210 pursuant to **63 Rule 19, SCRCP, or intervene in an action pursuant to Rule 24, SCRCP, lies within the sound discretion of the trial court."); Ware v. Ware , 404 S.C. 1, 10, 743 S.E.2d 817, 822 (2013) (stating on appeal from the family court, "The decision to deny or grant a motion made pursuant to Rule 60(b), SCRCP is within the sound discretion of the trial judge.'').
Stoney v. Stoney , 422 S.C. 593, 595 n.2, 813 S.E.2d 486, 487 n.2 (2018).
LAW/ANALYSIS
I. Brother's Intervention
Wife argues persuasively that the family court erred in its Final Order and decree of divorce on a number of bases. According to Wife, most problematic was "the trial court's surrender to the dictates of Husband's brother, the Third Party Intervenor, whose control was so great that the trial court instructed his attorney to prepare the Final Order in the case, then [signed] that order with no changes whatsoever and without allowing Wife's attorneys any input." (footnote omitted).
Wife contends the family court erred in allowing Brother to enter, and essentially control, the litigation. We agree and hold that even if the family court did not err in permitting intervention, the degree to which the court permitted Brother's counsel to involve himself in matters wholly unrelated to those in which Brother had a purported interest was certainly erroneous. Rule 24(a), SCRCP, provides:
Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
"Generally, the rules of intervention should be liberally construed where judicial economy will be promoted by declaring the rights of all affected parties." Ex parte Gov't Emp.'s Ins. Co. , 373 S.C. 132, 138, 644 S.E.2d 699, 702 (2007). Thus, this court "should consider the practical implications of **64 a decision denying or allowing intervention." Id. "However, a party must have standing to intervene in an action pursuant to Rule 24, SCRCP." Id. "A party has standing if the party has a personal stake in the subject matter of a lawsuit and is a 'real party in interest.' " Id. (quoting Bailey v. Bailey , 312 S.C. 454, 458, 441 S.E.2d 325, 327 (1994) ). "A real party in interest ... is one who has a real, actual, material or substantial interest in the subject matter of the action, as distinguished from one who has only a nominal, formal, or technical interest in, or connection with, the action." Id. (quoting Bailey , 312 S.C. at 458, 441 S.E.2d at 327 ).
Pursuant to the family court's order granting intervention, Brother was allowed to enter the litigation on the following grounds: (1) Brother was joint owner of some of the marital property, (2) he was co-obligor on certain marital debts, (3) he had mortgaged some of his own property to obtain funds for Husband's businesses, and (4) he made loans to Husband to protect Husband's business interests. Wife notes Brother did not seek to enforce any debts he alleges were owed to him by Husband until he filed this motion to intervene approximately nine months after the marital litigation commenced.
Wife also argues Brother lacked standing because he was not a "real party in interest." As discussed above, a "real party in interest" is one with a "real, actual, material or substantial interest in the subject matter of the action." See id. In support of her claim, Wife cites to Bailey , in which our supreme court held former attorneys for a party to domestic litigation lacked standing to intervene in the action with regard to an attorney's fees payment. 312 S.C. at 458, 441 S.E.2d at 327. The Bailey court explained that "the real interest lies with the parties in the divorce action-the appellants-and they alone have a real proprietary interest in the subject matter of the proceedings. We find that [the attorneys'] interest as claimants asserting a right to attorney fees is peripheral and not the real interest at stake." Id.
*211 Unlike the attorneys in Bailey , we find Brother satisfied the standing requirement of Rule 24, SCRCP. The record is replete with evidence that Brother had a property interest not only in the marital property, but also in other properties in which Wife argues she holds a marital interest. Brother was a **65 co-obligor of much of the marital debt, which was confirmed by the court-appointed CPA, Tracy Amos. We also agree with the family court in that considering Husband's tenuous financial condition, Brother's interest in the various pieces of property-many of which are a substantial part of this litigation-could not be adequately protected unless Brother was allowed to intervene. Thus, we find the family court did not err in initially determining Brother had an interest in certain property matters at issue in this litigation.
However, our review of the record establishes that the family court abused its discretion in failing to control the depth of Brother's intervention. Throughout the trial, Brother's counsel was permitted to interject objections and comments regarding matters that had nothing to do with Brother's property interests in the litigation.
For example, despite Brother's assertions that he had no ownership interest in Rice Market, Brother objected to questions regarding Rice Market's ownership, stating it "was acquired after the date of filing." Other examples reflecting Brother's unrelated involvement include (1) interrupting Husband when he tried to offer a stipulation; (2) "shushing" Husband when he made comments that might be adverse only to Husband's case; (3) successfully objecting to the introduction of the parenting coordinator's affidavit, despite Husband's statement that he was in agreement with it; (5) successfully making objections during the testimony of one of Wife's witnesses regarding Husband's false statements to various people about Wife's sexuality; and (6) cross-examining a former employee and babysitter of the couple regarding marital matters that had nothing to do with Brother or his financial interests. Of additional concern is that the family court requested that Brother's counsel draft the Final Order denying Wife's motion to alter or amend an interim order that dealt solely with the parties' grounds for divorce. There is simply no support in either the record or our case law to support the family court's decisions to allow (and even ask) Brother to involve himself-other than as a sworn witness-with issues related to either the grounds for the divorce or the parties' parenting and custody concerns.
**66 We find the family court improperly allowed Brother to influence the manner in which the assets and debts in the divorce case were distributed between Husband and Wife. Further, the family court's direction that counsel for Brother prepare the orders following trial, which the family court subsequently approved as its Final Order, confirms the extent of Brother's influence on issues in this litigation that in no way involved Brother or his interests, such as custody, child support, alimony, and fault. Cf. Ex parte Gov't Emp's Ins. Co. , 373 S.C. at 138-39, 644 S.E.2d at 702 ("GEICO has no real interest in whether Cooper and Goethe have a valid common law marriage. GEICO's interest is in the financial implications of the family court's decision, which is peripheral to the subject matter before the court."); id. at 139, 644 S.E.2d at 703 ("[T]he subject matter of the family court action in the instant case is the validity of a common law marriage, which does not involve a determination of insurance benefits. Accordingly, GEICO does not have standing to intervene in the family court action because it does not have an interest sufficiently related to the subject matter of the action."); Slatton v. Slatton , 289 S.C. 128, 129-30, 345 S.E.2d 248, 249 (1986) (holding titleholder to automobile was entitled to opportunity to appear as a litigant in divorce proceeding and "to offer evidence to protect her property interest.").
Therefore, we hold that while granting the motion to intervene itself may have been proper, the family court's actions in repeatedly permitting Brother to participate (and even control) certain decisions unrelated to the protection of Brother's property interests were erroneous.
II. Wife's Motion to Reopen the Case
After the two-week trial concluded, but before the family court issued its order, Wife *212 moved to reopen the case. Wife's motion was based on several documents she received relating to the sale of a ten-percent share in BHBI to Greg and Constance Holmes as well as Brother's interest in BHEC. Wife argued these documents were relevant to (1) the alleged debts owed to Brother, (2) the credibility of Husband and Brother, and (3) other relevant matters, including a possible undisclosed operating and ownership arrangement regarding BHBI. The family court denied Wife's motion to reopen. **67 Wife claims that on July 13 and 14, 2011, Constance Holmes gave her a number of documents, including the following:
• A document dated December 21, 2009, from Husband to Greg and Constance Holmes regarding a $175,000 loan secured by up to ten percent of Breach Inlet (BHBI) shares;
• A December 22, 2009 memorandum, from J & S Fish, LLC to Greg Holmes from Keith Jones[13] referencing a $250,000 loan to Crew Carolina secured by ten percent of the net restaurant stock of BHBI;
• A November 23, 2009 promissory note, in the amount of $75,000 (borrower Rice Market, LCC) to be organized and collateralized by an up to five percent interest in BHBI;
• A document titled "Private Placement Memorandum" on BHEC, stating Brother owns fifteen percent; and
• A December 23, 2009 promissory note, in the amount of $50,000 (borrower J & S Fish, LLC, d/b/a Amen Street Fish and Raw Bar) to Greg Holmes signed by Keith Jones.
To reopen a case based on newly discovered evidence, "a movant must establish that the newly discovered evidence: '(1) will probably change the result if a new trial is granted; (2) has been discovered since the trial; (3) could not have been discovered before the trial; (4) is material to the issue; and (5) is not merely cumulative or impeaching.' " Lanier v. Lanier , 364 S.C. 211, 217, 612 S.E.2d 456, 459 (Ct. App. 2005) (quoting James F. Flanagan, South Carolina Civil Procedure 484 (2d ed. 1996) ).
These documents are clearly material to at least one property in which Wife claims she holds an equitable interest and Brother claims a debt. Despite this (and the fact that Husband denied the existence of certain of these documents), the family court offered the following unsupported analysis: (1) the documents would not have affected the outcome of the case, (2) they could have been discovered prior to trial, and (3) Wife sought to use the documents to impeach Husband and Brother.
**68 As to the document dated December 21, 2009, Wife contended throughout the trial that the monies from the Holmes-be it Greg and Constance Holmes or Holmes Capital-were loans. On the other hand, Husband and his accountant, Chip Robinson, contended Holmes Capital purchased a ten percent interest in BHBI. In sum, either Husband owns a sixty versus seventy percent interest in BHBI, or he or his businesses owe repayment of the loan (or loans) to the Holmes. The family court found the net effect of this was immaterial, relying upon its dubious finding that the marital estate had a negative net worth.
The family court's immateriality finding was erroneous, however, because the documents, properly considered, would have affected the outcome of the litigation. The categorization of the "sale" of assets versus "loans" from Brother (and others), as well as the manner in which Husband conducted the accounting relating to BHBI (the only income producing property found to be marital), were the key issues at trial with respect to the valuation of the marital estate and its apportionment.
For example, the Ellis Creek "Private Placement Memorandum" provides Brother was given a fifteen percent interest in BHEC, perhaps with no monetary investment in this particular venture. If this fifteen percent interest was in repayment of certain *213 loans made by Brother, it should have offset at least some of the negative value the family court assigned the marital estate. Because the family court found the marital estate had a negative net worth based in large part upon Brother's marital debt allegations, business documents addressing Brother's ownership interests in marital assets or business ventures Husband may have financed (even in part) with marital funds certainly would have affected the outcome of the litigation in a properly conducted trial.
The Private Placement Memorandum and Rice Market documents are also material to Husband's control of BHBI, and his repeated use of this asset to fund subsequent business ventures. As noted previously, BHBI was the only remaining income-producing business the family court found to be marital property. And it is not insignificant that Wife holds her own pre-apportionment five percent interest as well as a five **69 percent interest as trustee on behalf of Child. The family court's ruling left Husband in control of not only the only marital income-producing asset, but also Wife and Child's non-marital percentage ownership interests. Thus, it is difficult to discern how such documents could not have affected the outcome of the litigation.
Nor can we agree that these documents could have been discovered prior to trial,[14] as the record is replete with evidence that Husband was evasive and uncooperative with discovery. This, along with the family court's repeated refusal to mandate that Husband comply with Rule 20, SCRFC's Financial Declaration requirement, mandates reversal.
III. Husband's Imputed Income
Wife argues the family court erred in imputing income of only $100,000 per year to Husband. Specifically, Wife claims the family court "completely disregarded the overwhelming evidence presented at trial" that Husband's actual income is $892,958 per year. To the extent Husband argues Wife has not preserved the imputation issue for review, we disagree. We find the family court's analysis of Husband's income was incomplete and erroneous.
In Marchant v. Marchant , 390 S.C. 1, 7, 699 S.E.2d 708, 711 (Ct. App. 2010), the wife alluded to the fact that the husband was capable of earning more in the final hearing; however, she did not request a finding that the husband was voluntarily underemployed for the purpose of imputing income, and the family court did not rule on the issue of income imputation. Id. This court subsequently determined that wife was required to file a Rule 59(e), SCRCP, motion to seek a ruling on that point, and she failed to do so. Id.
**70 Here, however, Wife raised the issue of Husband's income several times to the family court, and she filed a Rule 59(e), SCRCP, motion seeking that the family court alter or amend its ruling on this issue. Additionally, the court-appointed CPA testified that she neither analyzed Husband's income nor his lifestyle. Despite Wife's repeated requests, Husband was not required to provide a current financial declaration at the start of trial or during the two separate trial weeks.[15] Throughout the two-week trial, Husband referred to a financial declaration that was over a year old, and Wife's counsel systematically dismantled it on cross-examination. Significantly, the family court failed to consider evidence presented regarding the various funds Husband received from his business *214 entities, which he in turn used for personal expenses or to satisfy other obligations.
In Grumbos v. Grumbos , 393 S.C. 33, 43, 710 S.E.2d 76, 81 (Ct. App. 2011), the family court imputed additional income to Husband for purposes of calculating alimony, recognizing that "it was difficult to determine Husband's earning potential. Husband's testimony lacks credibility." In affirming, this court explained that "[w]ithout a meaningful representation of Husband's current income, the family court was required to resort to other credible evidence, namely the parties' expenses, in assessing income." 393 S.C. at 43, 710 S.E.2d at 82. Here, Husband's business records reflected distributions of the following: (1) approximately $76,000 from Crew, identified only as "Cash Disbursements"; (2) another $266,000 from Crew, identified only as "Miscellaneous Expenses"; and (3) over $258,000 from BHBI, identified only as "Miscellaneous Expenses."
Husband's testimony that none of these expenses or disbursements were for his personal use is contradicted when examined in conjunction with his financial records. Specifically, the following were paid to or on Husband's behalf by Crew **71 and BHBI: (1) approximately $14,000 for Husband's trips to France, New York, and Chicago; (2) approximately $4,400 in payments to Child's private school; (3) $42,000 in one year paid for his life insurance premiums; (4) thousands of dollars in payments on condo and farm mortgages; and (5) thousands of dollars paid to employees doing personal labor.
Husband claimed on multiple occasions throughout the trial that he was "broke" and survived on just $250 per week; however, as explained herein, the evidence shows Husband actually lived a comfortable lifestyle, despite his claims that he was likely being forced into bankruptcy. Based on the foregoing, we reverse and remand the income determination because the family court's imputation of only $100,000 in income per year to Husband was erroneous.
IV. Alimony
Wife argues the family court erred in failing to award her alimony, pointing to several factors she believes weigh heavily in favor of a substantial award of permanent alimony. Because we hold the family court improperly calculated Husband's imputed income, we reverse the denial of alimony and remand for the family court to conduct an appropriate alimony analysis.
"Alimony is a substitute for the support normally incident to the marital relationship and should put the supported spouse in the same position, or as near as is practicable to the same position, enjoyed during the marriage." Reiss v. Reiss , 392 S.C. 198, 208, 708 S.E.2d 799, 804 (Ct. App. 2011). "If an award of alimony is warranted, the family court has a duty to make an award that is fit, equitable, and just." Id. South Carolina law provides that "[t]he family court may grant alimony in such amounts and for such term as the judge considers appropriate under the circumstances." Id.
In determining an award of alimony, the family court must consider the following factors:
(1) duration of the marriage; (2) the physical and emotional health of the parties; (3) educational background of the parties; (4) employment history and earning potential of the parties; (5) standard of living during the marriage; (6)
**72 current and reasonably anticipated earnings of the parties; (7) current and reasonably anticipated expenses of the parties; (8) marital and nonmarital property of the parties; (9) custody of the children; (10) marital misconduct or fault; (11) tax consequences; (12) prior support obligations; and (13) any other factors the family court considers relevant.
Id. at 209, 708 S.E.2d at 804-05 (citing S.C. Code Ann. § 20-3-130(C) (2014) ). "However, '[t]he family court is only required to consider relevant factors.' " Id. at 209, 708 S.E.2d at 805 (alteration in original) (quoting King v. King , 384 S.C. 134, 142, 681 S.E.2d 609, 613 (Ct. App. 2009) ). Further, "[a]limony is not intended to be a reward to one nor a punishment to the other. It is basically for the purpose of maintaining the status quo as near as possible [as] established by the parties." Kane v. Kane , 280 S.C. 479, 484, 313 S.E.2d 327, 330 (Ct. App. 1984).
*215 Because the family court erred in calculating Husband's income and the marital debt-and reached no calculation as to the value of the marital estate, discussed infra -we reverse the denial of alimony to Wife and remand for the family court to consider Wife's entitlement to alimony in conjunction with an appropriate equitable apportionment analysis.
V. Child Support Determination
Wife argues the family court erred in its determination of child support by (1) not properly calculating Husband's income when it set the child support and (2) not considering the needs of Child. Because we hold Husband's income was improperly calculated, the child support award must be reversed as well.
In the Final Order, the family court ordered Husband to pay directly to Wife monthly child support of $821 pursuant to the South Carolina Child Support Guidelines. The family court based this number upon an imputed income to Wife of $45,000 annually and to Husband of $100,000 annually. Additionally, the family court ordered Husband to provide health insurance for Child; however, Wife was ordered to pay the first $250 of uncovered medical, dental, and prescription expenses incurred per calendar year.
In support of her argument that the family court should have departed from the Child Support Guidelines and required **73 Husband to provide additional benefits, Wife cites to Rabon v. Rabon , 288 S.C. 338, 342 S.E.2d 605 (1986). The court in Rabon held the trial court erred when it failed to consider the cost of private schooling for the children when they could benefit from enrollment and father was able to afford to contribute. Id. at 340, 342 S.E.2d at 606-07. In this case, Wife points out that Child grew up with the benefit of the following: (1) private schooling at Ashley Hall School, (2) attending summer camps, (3) a nice home, (4) vacation homes, (5) music lessons, (6) extensive travel, and (7) horseback riding/showing.
However, unlike the father in Rabon , it is not clear whether Husband can afford to pay for Child's private school education. While we agree with the family court that "both parties' standard of living must be substantially decreased as they have in the past lived off monies borrowed from various people or companies," we must remand this issue to the family court because Husband's income was not properly determined.
VI. Life Insurance to Secure Award of Alimony
Wife argues the family court erred in failing to require Husband to maintain life insurance or other security for alimony and child support. We remand this question for the court's consideration in conjunction with its alimony analysis and the recalculation of child support.
"The family court may order the payor spouse to obtain life insurance as security for an alimony or child support obligation if the supported spouse can demonstrate the existence of special circumstances with reference to her need for security and the payor spouse's ability to provide it." Smith v. Smith , 386 S.C. 251, 264, 687 S.E.2d 720, 727 (Ct. App. 2009). "In considering whether the supported spouse has demonstrated a need for such security, the family court shall consider 'the supported spouse's age, health, income, earning ability, and accumulated assets.' " Id. (quoting Wooten v. Wooten , 364 S.C. 532, 553, 615 S.E.2d 98, 109 (2005) ). "If a need for security is found, the family court should then consider 'the payor spouse's ability to secure the award with life insurance by considering the payor spouse's age, health, income earning ability, accumulated assets, insurability, cost of premiums, and insurance plan carried by the parties during **74 the marriage.' " Id. (quoting Wooten , 364 S.C. at 553, 615 S.E.2d at 109 ).
Wife argues "the circumstances justify requiring Husband to secure his alimony and child support payments with the same life insurance he had for the benefit of Wife and daughter during the marriage." As to these circumstances, Wife pointed out that Husband, who was fifty-nine at the time of trial, is fifteen years older than Wife. Additionally, Child was twelve years old at the time of trial.
*216 Our review of the record and the family court's orders does not demonstrate that the family court properly considered the need for the security or Husband's "income, earning ability, and accumulated assets" with respect to any of its findings. Thus, we reverse and remand the question of requiring Husband to maintain life insurance or other support security.
VII. Equitable Division of Marital Assets and Debts
Wife argues the family court erred in identifying, valuing, and apportioning various marital assets and debts. Specifically, Wife asserts the family court erred in: (1) its determination and apportionment of the marital interests in BHBI; (2) finding no "special equity" or transmutation in Kensington Plantation and the King Street properties; (3) its determination and apportionment of the "debts" owed to Brother; (4) ordering that Wife be responsible for certain debts owed to Brother; (5) failing to credit the marital estate with 50% of the $175,000 upfit monies; (6) reducing the value of 101 Palm Boulevard by $424,203; (7) failing to apportion valuable marital artwork between the parties; and (8) failing to include Wife's debts in the equitable division.
The equitable apportionment statute, section 20-3-620(B) of the South Carolina Code (2014), enumerates the factors that must be considered by the family court in determining the appropriate division of marital assets. See Smith v. Smith , 327 S.C. 448, 460, 486 S.E.2d 516, 522 (Ct. App. 1997) (discussing the predecessor statute to section 20-3-620 ).
These [factors] include, inter alia , the duration of the marriage, marital misconduct by either spouse, the health of each spouse, the income of each spouse, and the contribution **75 of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker.
Id.
As set forth above, the family court's conduct of the trial with regard to Brother's interest in the marital estate and Husband's debts owed to Brother was problematic and erroneous, leading to its finding that "[t]here is no equity in the marital assets." The root of this error, exacerbated by the conduct of the two-week trial itself, was the failure of the family court to "ensure that the debts were incurred for the joint benefit of the parties during the marriage." See Allen v. Allen , 287 S.C. 501, 507, 339 S.E.2d 872, 876 (Ct. App. 1986) (reversing portions of equitable distribution award which charged marital estate with loans from husband's sister and denied wife any interest in office building erroneously determined to have no equity to divide). In Allen , our court emphasized that "loans from close family members must be closely scrutinized for legitimacy." Id . No such scrutiny was applied in this matter.
We find the family court erred in ignoring the extent to which Kensington Plantation and the King Street properties have been interwoven with the debts owed Brother and the ongoing financing of the marital (and Husband's newer) business ventures. This, in addition to the errors noted above with regard to the family court's lack of concern with the unauthorized sale of ten percent of BHBI (and the undisclosed documents detailing such), the income from BHBI that the court failed to attribute to Husband, the failure of the court to consider Brother's undisclosed interest in BHEC, and the use of BHBI funds for such new ventures as Amen Street, J & S Fish, LLC, and Rice Market requires reversal of the entire equitable apportionment analysis as to both marital assets and marital debt.
VIII. Wife's Special Equity in New Businesses
Wife argues Husband has used marital funds from the couple's various businesses to fund the construction and operation of Amen Street Fish and Raw Bar, J & S Fish, LLC, and the Rice Market restaurant despite Husband's claims that BHBI-his only income-producing asset-struggles **76 to make payroll. For the aforementioned reasons, we reverse the family court's denial of a special equity to Wife. On remand, in consideration of this question, the family court must determine if the new businesses have been supported with funds either (1) earned by BHBI prior to the date of filing or (2) in *217 which Wife and Child hold a percentage interest.
IX. Contempt
Wife argues the family court erred in failing to find Husband in contempt for refusing to pay his portion of the fee for the court-appointed CPA as well as the fees Husband was ordered to pay Wife's attorney upon consideration of the sixth rule to show cause. We agree.
"Contempt results from the willful disobedience of an order of the court." Bigham v. Bigham , 264 S.C. 101, 104, 212 S.E.2d 594, 596 (1975) ; Smith v. Smith, 359 S.C. 393, 396, 597 S.E.2d 188, 189 (Ct. App. 2004) ; S.C. Code Ann. § 63-3-620 (Supp. 2015) ("An adult who wilfully violates, neglects, or refuses to obey or perform a lawful order of the court, or who violates any provision of this chapter, may be proceeded against for contempt of court."). "A willful act is one which is 'done voluntarily and intentionally with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or disregard the law.' " Widman v. Widman , 348 S.C. 97, 119, 557 S.E.2d 693, 705 (Ct. App. 2001) (quoting Spartanburg Cty. Dep't of Soc. Servs. v. Padgett , 296 S.C. 79, 82-83, 370 S.E.2d 872, 874 (1988) ). "Where a contemnor is unable, without fault on his part, to obey an order of the court, he is not to be held in contempt." Smith-Cooper v. Cooper , 344 S.C. 289, 301, 543 S.E.2d 271, 277 (Ct. App. 2001).
Husband's contempt sentence from the sixth rule to show cause was suspended on the condition that he make the court-ordered payments to the court-appointed CPA and Wife's attorney. Because Husband failed to make the two payments, the family court erred in failing to hold Husband in contempt or in any way address his nonpayment.
**77 X. Grounds for Divorce
Wife next argues the family court erred in failing to grant her a divorce on the ground of adultery because the court's findings in the interim order granting the divorce on the ground of the parties' one-year separation are not supported by the preponderance of the evidence.[16] As Wife presented the clear and positive evidence necessary to establish infidelity while scant evidence supports the findings in the interim order, we agree and reverse.
In Brown v. Brown , 379 S.C. 271, 277-78, 665 S.E.2d 174, 178 (Ct. App. 2008), this court held proof of adultery must be made by a clear preponderance of the evidence and it may be proven by circumstantial evidence that shows a disposition to commit the offense as well as the opportunity to do so. "Generally, 'proof must be sufficiently definite to identify the time and place of the offense and the circumstances under which it was committed.' " Id. at 278, 665 S.E.2d at 178 (quoting Loftis v. Loftis , 284 S.C. 216, 218, 325 S.E.2d 73, 74 (Ct. App. 1985) ).
The record here is well-developed on the question of Husband's adultery; thus, this court may make its own findings in accordance with the preponderance of the evidence. Thomson v. Thomson , 377 S.C. 613, 623, 661 S.E.2d 130, 135 (Ct. App. 2008) (recognizing the appellate court may, "[when] the record is sufficient, make its own findings of fact in accordance with the preponderance of the evidence." (quoting Badeaux v. Davis , 337 S.C. 195, 203, 522 S.E.2d 835, 839 (Ct. App. 1999) ) ).
In his Answer and Counterclaim, Husband admitted his adultery as to one paramour, but denied it as to another. Wife presented evidence from a private investigator, however, which belied Husband's denial. After the filing of the Answer and Counterclaim-and at trial-Husband admitted to his adulterous relationships with both women. Although we decline to detail here all of the evidence presented by Wife, one event bears mention. Less than two months after the parties' separation, one of the paramours spent the night with Husband **78 while Child was present. When Wife learned of this occurrence, she filed the action seeking a divorce.[17] *218 The family court's own final order acknowledges Husband's fault-in the section of the order in which the court denies Wife alimony. The court found, "The Defendant [Husband] was at fault for having sexual relationships either at or after the parties' separation ... prior to the issuance of the Court's Temporary order ...." (Emphasis added ). Yet the court's interim order granting the divorce ignores Wife's evidence and Husband's admissions, finding simply that "the ultimate and proximate cause for the break-up of this marriage was the separation of the parties, not the post separation adultery." In light of these conflicting findings, the family court's erroneous finding of a 2007 separation date,[18] Husband's admissions, and the corroborated evidence presented by Wife, we grant Wife a divorce on the ground of adultery.
XI. Attorney's Fees
Finally, Wife argues the family court erred in not awarding her attorney's fees and costs. We agree.
Section 20-3-130(H) of the South Carolina Code (2014) authorizes the family court to order payment of litigation expenses to either party in a divorce action. "A family court should first consider the following factors as set forth in E.D.M. v. T.A.M. , in deciding whether to award attorney's fees and costs: (1) each party's ability to pay his or her own fee; (2) the beneficial results obtained by the attorney; (3) the parties' respective financial conditions; and (4) the effect of the fee on **79 each party's standard of living." Farmer v. Farmer , 388 S.C. 50, 57, 694 S.E.2d 47, 51 (Ct. App. 2010) (citing E.D.M. , 307 S.C. at 476-77, 415 S.E.2d at 816 ). "A party's ability to pay is an essential factor in determining whether an attorney's fee should be awarded, as are the parties' respective financial conditions and the effect of the award on each party's standard of living." Rogers v. Rogers , 343 S.C. 329, 334, 540 S.E.2d 840, 842 (2001) (citing Sexton , 310 S.C. at 503, 427 S.E.2d at 666 ).
Here, the Final Order generally acknowledges the E.D.M. factors in deciding whether to award attorney's fees, but this finding is significantly impacted by the family court's erroneous rulings on Husband's income, alimony, and child support. Further, "if the substantive results obtained by counsel are reversed on appeal, the attorney's fee award must also be reversed." Sexton v. Sexton , 310 S.C. 501, 503-04, 427 S.E.2d 665, 666 (1993) ; see also , E.D.M. v. T.A.M. , 307 S.C. 471, 477, 415 S.E.2d 812, 816 (1992) (reversing the award of attorney's fees where the substantive results achieved by counsel were reversed on appeal).
A proper calculation of Husband's true income would establish his greater ability to pay fees. In addition, Husband's behavior in eliciting six rules to show cause, as well as his conduct throughout the trial, significantly increased the costs of this litigation. Thus, we reverse and remand with instructions for a proper analysis and award of Wife's attorney's fees and costs, including the ongoing suit costs she will likely incur on remand.
As to expert costs, the family court found both parties should equally bear the costs of the court-appointed CPA, Tracy Amos. We agree with Wife's argument that there is nothing in the Final Order regarding the reallocation of fees previously ordered to be paid to Amos. Therefore, we conclude this matter should also be remanded to the family court for a determination of the proper allocation of litigation expenses, including the impact of the rulings to be made on any open contempt issues.
*219 CONCLUSION
"When an order from the family court fails to make specific findings of fact in support of the court's decision, the **80 appellate court may remand the matter to the family court" but when the record is sufficient, the court "may make its own findings of fact in accordance with the preponderance of the evidence." Thomson , 377 S.C. at 623, 661 S.E.2d at 135.
Unfortunately, the record here simply does not provide the information necessary for this court to make its own findings as to Husband and Wife's actual marital assets and debts, Husband's true income, the BHBI income not properly distributed to Wife and Child (with respect to both marital income and in accordance with their percentage ownership interests), the income Husband diverted to fund his ongoing business ventures, any legitimate debts that may be owed Brother, and the extent to which Brother may or may not have an interest in certain marital properties.[19] Because of the conduct of the trial, Wife did not have a full and fair opportunity to develop the record and present the necessary evidence on these issues. Thus, we are unable to simply correct any error found in our de novo review. Instead, we must reverse and remand for the family court to proceed in accordance with this opinion. We grant Wife's request for a divorce on the ground of adultery.
REVERSED AND REMANDED.
WILLIAMS and GEATHERS, JJ., concur.

In its refiled opinion, the supreme court clarified that "Lewis did not address the standard for reviewing a family court's evidentiary or procedural rulings, which [our appellate courts] review using an abuse of discretion standard." Stoney , 422 S.C. at 595 n.2, 813 S.E.2d at 487 n.2.

Husband produced neither the original nor a signed copy of the prenuptial agreement; however, he did include a copy of an unsigned prenuptial agreement as an exhibit to his affidavit.

Child was nine-years-old when this case was filed and twelve at the time of trial.

At the date of filing, the ownership structure of BHBI was as follows:
Husband-70%
Brother-10%
Wife-5%
Richard Stoney Jr. (in Trust)-5%
Child (in Trust with Wife as Trustee)-5%
Lawrence Stoney-5%

The parties stipulated that Wife assisted Husband in the operation of the couple's restaurants and businesses.

The property was later reopened as another restaurant.

After Wife discovered the impending sale of Carolinas, she filed a motion for protection, which resulted in a February 17, 2011 order requiring that Brother's attorney hold in escrow the remaining proceeds and any funds still in escrow. At trial, Wife testified that she had received nothing from the sale of Carolinas.

The majority of the sale price was paid up front to Husband; however, the buyer also gave Husband a note, $75,000 of which was paid off prior to trial. Husband stipulated at trial that he paid one of his business partners, Thomas Westfeldt, $270,000 from these proceeds, which reduced a $550,000 note held by Westfeldt. The remainder of this note is secured by the Isle of Palms property.

Husband has obtained summary judgment and an award of $250,000 against Choto's owner; however, the collection of this sum had not yet occurred as of the date of oral argument. The family court did not address this judgment in its final order.

The property has since reopened as another restaurant.

The family court found Husband "knowingly, willfully and even defiantly exposed the minor child to his paramour and has shown a blatant disregard" for the consent order.

Husband has not appealed this order of contempt.

Keith Jones is the managing member of J & S Fish, LLC, which is the company that operates "The Amen Street Fish and Raw Bar."

It is difficult to determine how the family court reached its conclusion that Wife could have discovered the documents prior to trial because Husband, an attorney, testified that certain of these documents did not exist. See e.g. , Chewning v. Ford Motor Co. , 354 S.C. 72, 82, 579 S.E.2d 605, 610-11 (2003) ("Contrary to perjury by a witness or a party's failure to disclose requested materials, conduct which constitutes intrinsic fraud, where an attorney-an officer of the court-suborns perjury or intentionally conceals documents, he or she effectively precludes the opposing party from having his day in court.").

Husband filed only two financial declarations, one in June of 2009, and one in January of 2010, each reflecting his income to be $8,333 per month. These financial declarations include only the income Husband received from Crew Carolina. They in no way accurately reflect the disbursements paid directly to certain creditors on Husband's behalf, to Husband to cover certain personal expenses, or to Husband (or others for Husband) to fund other business concerns.

Neither party sought a divorce on the ground of one year separation in their pleadings.

Wife clearly established Husband committed adultery with one employee paramour around the time the parties separated-the catalyst for the separation-and with a second employee paramour shortly after the separation of the parties but prior to the date of filing-the catalyst for the divorce action.

For example, the interim order finds plaintiff's former counsel testified the parties separated in 2007. He did not. He merely stated Husband told him the parties had separated. Husband admitted to spending a single night on his boat in 2007. Testimony at trial established March 2009 as the time of the parties' separation. Wife returned home from a trip with Child to find that Husband had not stayed at the home on the previous night. The parties separated after this incident. Phone records and Husband's admissions corroborated this testimony.

Regrettably, this is in large part due to Husband's antics and the family court's repeated failure to address his contemptuous behavior.