HILL, J.:
*202 **456 In this appeal, Patricia Clark (Wife) argues the family court erred in (1) setting child support; (2) finding 75% of Pure Country, Inc. (PCI) was non-marital property; (3) valuing Wife's 25% interest in PCI at $75,000; and (4) refusing to order George Clark (Husband) to contribute to her attorney's fees. We affirm in part and reverse in part.
**457 I.
In 2012, after twenty-five years of marriage, Husband sought a divorce from Wife on the ground of adultery. The parties had three children; one was still a minor at the time of filing. The parties met in 1982 at Emory University. Husband later obtained an MBA and worked for several businesses before joining PCI, his parents' and sister's company, in sales. He became president of PCI around 2001 after his mother stepped down. Wife began working for PCI a few years later, eventually becoming the art director. At the time of filing, Husband was the president of PCI and owned 75% of the stock; Wife owned the remaining 25%. The family court (1) granted the parties a divorce on the ground of one year's separation; (2) granted the parties joint custody and ordered Husband to pay Wife $744 a month in child support; (3) found Wife's adultery barred her from receiving alimony; (4) found Husband's 75% interest in PCI non-marital and valued Wife's 25% interest at $75,000; and (5) found each party responsible for their own attorney's fees.
II.
We review decisions of the family court de novo. Stoney v. Stoney , 422 S.C. 593, 596, 813 S.E.2d 486, 487 (2018). We may find the facts based on our view of the greater weight of the evidence. Lewis v. Lewis , 392 S.C. 381, 384, 709 S.E.2d 650, 651 (2011). This does not, however, require us to ignore the reality that the family court saw and heard the witnesses and was in a better position to gauge their credibility. The appellant bears the burden of convincing us the family court erred. Evidentiary and procedural rulings of the family court, however, are reviewed for an abuse of discretion. Stoney , 422 S.C. at 594 n.2, 813 S.E.2d at 486 n.2.
III.
Husband argues Wife did not timely serve her notice of appeal. We disagree.
Rule 203 of the South Carolina Appellate Court Rules requires Wife to serve her notice of appeal within thirty days of her receipt of written notice of entry of the order on appeal. She did. Wife received written notice of entry of the order **458 denying her motion for reconsideration on September 11, 2015. Because October 11, 2015, was a Sunday, and October 12, 2015, was a federal holiday, Wife's deadline to file and serve her notice of appeal was October 13, 2015, and she served her notice of appeal on October 12, 2015, giving us jurisdiction. See Rules 262(a)(2) and 263(a), SCACR.
IV.
Wife argues the family court erred in refusing to deviate from the Child Support Guidelines when it awarded child support, contending the amount is inadequate and the family court should have imputed additional income to Husband. We disagree.
We must presume the guideline amount is correct; Wife may rebut this presumption by showing it is "unjust or inappropriate." S.C. Code Ann. § 63-17-470(A) (2010). "Deviation from the guidelines should be the exception rather than the rule." S.C. Code Ann. Regs. 114-4710 (Supp. 2018). The family court may impute income to a party with respect to awards of child support. Jenkins v. Jenkins , 401 S.C. 191, 203, 736 S.E.2d 292, 299 (Ct. App. 2012).
We find the family court did not err in refusing to impute additional income to Husband. Wife argues Husband underreported his income on his financial declaration, but *203 there is insufficient support for this in the record. The family court excluded Wife's forensic accounting report of Husband's income and the expert's testimony regarding it because Wife did not produce the report within the discovery deadline. Wife admitted at the motion to reconsider hearing that the family court properly excluded the forensic accounting report. Wife did not present any documentary evidence supporting her argument that Husband's financial declaration was inaccurate.
The parties share joint custody. Wife does not offer any evidence of how the guideline amount is unjust or inappropriate. She does not point to any expenses or outstanding needs of Child she will be unable to cover. Wife did not prove any statutory factors or present any evidence warranting a deviation. See S.C. Code Ann. § 63-17-470(C) (2010) (setting forth factors family court can consider for deviation from the guidelines).
**459 We therefore affirm the family court's child support order.
V.
Wife next challenges the equitable distribution award, arguing the family court erred in finding Husband's 75% share of PCI was non-marital property. We disagree. A party who claims property acquired during the marriage is non-marital bears the burden of proving the property is non-marital. Brandi v. Brandi , 302 S.C. 353, 356, 396 S.E.2d 124, 126 (Ct. App. 1990). Thus, Husband bore the burden of proof at trial. However, Wife has not shown the family court's finding that PCI was a non-martial asset was against the greater weight of the evidence. See Lewis , 392 S.C. at 384, 392, 709 S.E.2d at 651-52, 655 (stating the appellant bears the burden of proving the family court committed error or that the greater weight of the evidence is against the court's findings).
When Husband joined PCI, his Mother and Father each owned 37.5% of the shares, and his sister owned the remaining 25%. When Mother died in 2002, many of her assets, including her PCI shares, flowed to what is known as an "AB" Trust, designed to reduce tax liability. Husband testified without contradiction that Father, as Trustee, filled Trust A to the maximum allowable amount with assets other than Mother's PCI shares, which then automatically went into Trust B. This transferred Mother's shares to Father, the beneficiary of Trust B. After Mother's death, Husband's sister and brother sued Father and Husband, challenging Father's competency and seeking to wrest control of the company from Father and Husband.
While this suit was pending, two important events occurred. First, as Husband testified, Father had once intended to give PCI to all three of his children, but given the lawsuit, he decided to gift it to Husband only. There was no evidence Father wished to include Wife in this bequest or otherwise give her any ownership in PCI. Second, Husband's sister agreed to sell her 25% share to the company and drop the lawsuit. Granted, the evidence was far from seamless, and Husband contradicted himself more than once on the timelines **460 and details of the company ownership, but PCI's corporate tax returns for 2003 show Husband owned 75% of the company's shares. In her testimony, Wife acknowledged Husband's ownership without conceding PCI was non-marital.
Beginning in January 2006, several tragedies befell Husband. His brother was murdered by his sister's husband, with his sister later being convicted as an accessory. Later that year, Father died. By 2008, PCI was under financial pressure. Husband's financial and family woes sent him into profound depression. Meanwhile, Wife began an affair with a PCI employee who reported to her. Wife testified the relationship was an "arrangement," and Husband had agreed to allow her a "sexual surrogate." In 2010, while still pursuing her affair, Wife asked Husband for ownership of part of PCI. Husband testified Wife was concerned about protecting their children's inheritance should anything happen to Husband, telling him PCI was "clearly yours. It's a family business." Acting on behalf of PCI, Husband gave Wife a 25% interest in PCI, memorialized in a stock transfer agreement that included Wife's acknowledgment that the agreement could not be construed as giving Wife "any right to be awarded any further stock other than in the *204 sole discretion of the Board of Directors of the Company." In 2012, Husband learned of the affair when he discovered a salacious picture Wife's lover had texted her. Shortly thereafter, Husband fired them both from PCI. The family court found Wife's assertions that Husband knew of and consented to her adultery incredible, a finding not challenged on appeal.
The trial lasted eight days. After hearing the evidence and sizing up the witnesses, the family court found Father intended to gift PCI to Husband, and therefore ruled Husband's 75% interest non-marital.
Our supreme court has held a spouse's testimony alone, absent evidence to the contrary, is sufficient to establish the non-marital nature of property. See Wilburn v. Wilburn , 403 S.C. 372, 385-86, 743 S.E.2d 734, 741 (2013) (rejecting argument that testimony of spouse asserting bank account was non-marital must be supported by documentary evidence). Here, Husband testified Father gifted PCI to him, therefore providing the only direct evidence in the record concerning **461 ownership of PCI. See Fuller v. Fuller , 370 S.C. 538, 551-52, 636 S.E.2d 636, 643 (Ct. App. 2006) (finding a party's interest in a company was not a gift because he did not offer any evidence "by way of check or testimony"). He testified it was a gift from his Father and explained his Father's compelling reasons for the gift. Husband testified Father had signed his shares over to Husband, noting the transaction was "not ceremonial." See Barr v. Barr , 287 S.C. 13, 15, 17, 336 S.E.2d 481, 483-84 (Ct. App. 1985) (discussing similar issue regarding whether alleged gift from father to child was a gift; this court noted family court's superior position to gauge credibility and affirmed the ruling that the transaction was a gift). We find Husband's testimony regarding Father's gift, coupled with the evidence of Wife's stock transfer agreement that restricted the terms of Wife's 25% interest in PCI, sufficient to prove Husband's interest in PCI was not marital property. See Smith v. Smith , 386 S.C. 251, 270, 687 S.E.2d 720, 730 (Ct. App. 2009) (finding property non-marital based on testimony, financial records, and lack of evidence of the parties treating it as martial property during their marriage).
Wife did not directly contradict Husband's version of how he came to own PCI. Instead, she offered the testimony of her financial expert, who opined PCI was marital property. Wife's expert highlighted the absence of any gift tax return. He tried to show Husband, while President of PCI, purchased Father's shares by using company funds to pay for a cruise and an RV for Father, items that cost around $160,000.00. According to Wife's expert, this compensation was consideration for Father's transfer of the PCI stock, meaning no gift occurred. The logic of this argument is fuzzy. If Father sold the stock rather than gifted it, he necessarily sold it back to PCI. If Wife's expert's theory is right, then the sale was a bargain because he noted Mother's estate inventory valued her 37.5% of shares at $340,000, meaning Father would have sold 75% of the shares for $160,000, shockingly less than the estate valuation or the $1.8 million value Wife's expert placed on PCI. Even if we bought into this speculative lark, such bargain sales are treated by the IRS as partial gifts. See 26 I.R.C. § 2512(b) (2011). Wife's expert also claimed Father was compensated through increased lease payments from PCI and the use of a company credit card, but neither of these theories had **462 anything but innuendo to back them up. Wife's expert's conclusions were unhinged on cross-examination when it became apparent much of his analysis rested on a misconception of the mechanics of Mother's trust.
Like the family court, we find Wife's request for part ownership of PCI and the 25% stock transfer to her revealing. This transaction makes no sense if Wife believed PCI was marital property. People do not generally try to bargain for ownership of things they believe they already own in full. Nor do they, after receiving part, put in writing their acknowledgment that they have no further right to the whole. The 25% transferred to Wife became marital property, and the transaction corroborates Husband's claim that the remaining 75% was his separate property acquired by gift from Father rather than through the efforts of the marriage.
*205 Lastly, Husband's lack of compliance with the gift tax laws, however inexcusable, is not dispositive. See Smith , 386 S.C. at 268 n.3, 687 S.E.2d at 729 n.3 (providing the failure to file a gift tax return "is not dispositive on the issue of whether a gift was actually given").
For all these reasons, we affirm the family court's finding that 75% of PCI was Husband's non-marital property not subject to equitable distribution.
VI.
Wife contends the family court erred in valuing PCI and in applying both a marketability discount and a lack of control discount in valuing Wife's 25% interest.
We disagree that the family court erred in valuing PCI as a whole but agree it erred in valuing Wife's 25% interest.
When valuing business interests, the family court is required to determine the fair market value of the business as an ongoing concern by considering the business's net value, the fair market value for its stock, and its earnings or investment value. Reid v. Reid , 280 S.C. 367, 373, 312 S.E.2d 724, 727 (Ct. App. 1984) ; see also Santee Oil Co. v. Cox , 265 S.C. 270, 273, 217 S.E.2d 789, 791 (1975).
Husband's expert, Catherine Stoddard, CPA, appraised PCI using the methods of asset value, fair market value, and **463 earnings or investment value and assigned relative weight to each method. Because PCI was not going to be sold, she gave the asset valuation method only 10% weight. She gave the market value approach 10% weight, as there were insufficient comparable sales. She gave the investment approach the remaining 80% weight. Using a capitalization of earnings or investment method, Stoddard determined PCI's fair market value to be $465,461, and therefore, a 25% interest to be $116,365. She then applied a 35% marketability discount to the 25% interest, resulting in a fair market value of $75,637.
a. Valuation of PCI as a whole
The family court adopted Stoddard's valuation of PCI, finding it was more thorough, better reasoned, and more credible than Wife's expert's valuation. We agree. Stoddard more accurately examined PCI's history and business. She analyzed PCI's tax returns to obtain the income for her valuation, whereas Wife's expert adjusted PCI's financials by comparing them to companies whose similarity to PCI was dubious. Wife's expert questioned the reliability of PCI's financial records, but never pointed to concrete examples supporting his premise.
We reject Wife's argument that the family court should have placed more weight on Husband's purchase on behalf of PCI of his sister's shares for $400,000 payable over fourteen years without interest. Husband testified family distress drove this purchase; at the time, his sister and brother were suing their father for control of PCI, and he bought his sister's interest in hopes of healing the family discord. This sale does not represent the fair market value of the 25% interest because of the family dynamics crowding the transaction. Therefore, we affirm the family court's valuation of PCI.
b. Marketability discount
Wife argues Moore v. Moore , 414 S.C. 490, 779 S.E.2d 533 (2015), prohibits any marketability discount. Moore , decided after the family court's ruling here, held a marketability discount inapplicable when one spouse retained ownership of the business. Id. at 525, 779 S.E.2d at 551. Husband has no plans to sell PCI. Therefore, to the extent the marketability **464 discount reflected an anticipated sale, Moore deems it a fiction South Carolina law no longer recognizes.
Stoddard also based the marketability discount on the stock restriction attached to the 25% interest that limits transferability to certain family members and other insiders. As Stoddard explained, the restriction narrows the market for the stock to a handful of people, impairing the owner's ability to convert it into cash. It may be that Husband, as controlling shareholder, could remove the restriction on the shares once he owned them, but the record is silent as to this power. If, though, Husband has no plans to sell PCI then the stock restriction's effect on value is just as phantom as the discount rejected in *206 Moore ; both concern liquidity, which Moore held irrelevant to the fair market value of a closely held business for equitable distribution purposes when one spouse intends to retain ownership. We therefore hold use of the marketability discount improper under these specific facts.
c. Minority or lack of control discount
Wife contends that by discounting the value of the 25% interest in PCI for lack of control, and then awarding the stock to Husband, the majority and controlling shareholder, the family court provided a windfall to Husband. Wife relies on Fields v. Fields , which affirmed the family court's refusal to discount the value of a wife's 18% interest in a family company where her father owned the remaining 82%. 342 S.C. 182, 189-90, 536 S.E.2d 684, 687-88 (Ct. App. 2000). Fields held the family court did not abuse its discretion by agreeing with Husband's expert that the minority interest was worth more in Wife's hands than Husband's given Wife's father's animus toward Husband and the likelihood of the father's attempts to "squeeze" the minority interest if Husband retained it. Id .
Fields is best limited to its facts and cannot be read as barring discounting the value of a spouse's minority interest anytime the other spouse owns (or is aligned with the owner of) a majority of the closely held business. See Pratt, Business Valuation Discounts and Premiums (2d Ed. 2009) at 38 (noting some equitable distribution cases have "reasoned that the minority owner actually has a share of control through **465 family or other operating owners, although this logic generally leads to bad economic decisions and should not form the basis for any valuation adjustment"). Wife cross-examined Stoddard based on such a reading, but did not refer to Dowling v. S.C. Tax Commission , 312 S.C. 194, 439 S.E.2d 825 (1993), a gift tax case much more on point. Persuaded by the use of minority discounts by the IRS, Dowling affirmed a 30% discount to the value of each of the 20% shares gifted to five children, and "decline[d] to hold that as a matter of state law, minority stock discounts for family-held corporations are not allowed." Id . at 198-99, 439 S.E.2d at 828.
Marital assets must be assigned their fair market value, which means by the rationality and objectivity of the market rather than the subjective eye of the ultimate beholder, the distributee spouse. Because valuation must precede distribution, the family court cannot place different values on the same asset depending on which spouse receives it. To do so would upend both the concepts of fair market value and equity, and ignore the requirement that assets be valued as of the filing date. We can envision, for example, a situation where a controlling shareholder spouse embroiled in a divorce may wish to pay more than fair market value for a minority interest held by the other spouse simply to remove that spouse from any ownership position. But valuing assets in such manner needlessly complicates the family court's already difficult tasks and adds the vagaries of opportunity cost and other variables to the process, distorting the concept of fair market value. See Pratt, supra , at 10 (noting the model of the hypothetical seller and buyer underlying the fair market value standard is "intended to eliminate the influence of one buyer's or seller's specific motivations").
Wife is in essence advocating adoption of a "fair value" standard for her minority shares of closely held corporate stock, rather than "fair market value." Put another way, Wife maintains the business should be valued as a whole and the shares awarded their pro-rata value without any discount. To be sure, some states have banished the minority discount as incompatible with "fair value," often in the context of dissenter's rights litigation. See Cavalier Oil v. Harnett , 564 A.2d 1137, 1145 (Del. 1989) ; see also S.C. Code Ann. § 33-13-102 (2006) ; Heglar, **466 Rejecting the Minority Discount , 1989 Duke L.J. 258 (1989). Some liken a spouse holding minority ownership of a family business in the divorce context to a dissenting minority shareholder: both are under some degree of pressure, and often must sell their interest to the controlling owner. See, e.g., Grelier v. Grelier , 44 So.3d 1092, 1097-99 (Ala. Civ. App. 2009) ; Congel v. Malfitano , 31 N.Y.3d 272, 101 N.E.3d 341, 357-66 (N.Y. 2018) (Fineman, J., dissenting) (canvassing *207 policy reasons for abolishing minority discounts in partnership dissolution); Miller, Discounts and Buyouts in Minority Investor LLC Valuation Disputes Involving Oppression or Divorce , 13 U. Pa. J. of Bus. L. 607, 633-38 (2011). It can also be argued that discounts run counter to the view of marriage as an economic partnership whose assets are to be divided equitably in the event of dissolution.
But in the realm of equitable division in our state, we are bound by the standard of "fair market value" rather than "fair value." And many jurisdictions continue to discount the fair market value of minority stock ownership when equitably dividing marital estates. See, e.g. , Schickner v. Schickner , 237 Ariz. 194, 348 P.3d 890, 895 (Ariz. Ct. App. 2015) ; Arneson v. Arneson , 120 Wis.2d 236, 355 N.W.2d 16, 22 (Wis. Ct. App. 1984) ; Hanson v. Hanson , 125 P.3d 299, 308-09 (Alaska 2005) ; Rattee v. Rattee , 146 N.H. 44, 767 A.2d 415, 420-21 (2001) ; Siracusa v. Siracusa , 30 Conn.App. 560, 621 A.2d 309, 314-15 (1993) ; cf . McCulloch v. McCulloch , 69 A.3d 810, 823 (R.I. 2013) (approving the use of minority discounts, but noting they are unnecessary when a spouse receives cash equivalent rather than in kind distribution of the minority interest). The most cited decision rejecting minority discounts appears to be Brown v. Brown , 348 N.J.Super. 466, 792 A.2d 463 (2002), but New Jersey uses a "fair value" standard, and even that court agreed minority discounts could apply in extraordinary circumstances. Id . at 490, 779 S.E.2d 533 ; see also Grelier , 44 So.3d 1092, 1097-99 (following Brown ).
Stoddard valued the 25% interest using a capitalization of earnings method that took into account the minority position. This is a crucial point. The earnings method requires the appraiser to establish a company's income stream, which is then used as a benchmark for the valuation. Stoddard chose to accept PCI's income stream "as is" in one important respect: she did not adjust the abnormally high owner's compensation **467 and other discretionary ownership benefits. As her report noted, she could have chosen to reduce the owner's compensation and benefits to industry norms. This would have increased PCI's net income stream, to which she would have then applied a minority or lack of control discount to Wife's 25% interest. Instead, Stoddard chose to not adjust the income stream in this regard, removing any need to later apply a minority discount. As Stoddard noted, a lack of control discount inheres in the unadjusted stream because a minority owner has no ability to reduce or change the owner's compensation or benefits. However, this approach to valuing PCI's income stream resulted in an effective minority discount of 44%.
We hold a minority or lack of control discount may be considered when valuing a minority interest in a closely held business as part of the equitable division of the marital estate. We find the discount appropriate here because a holder of Wife's 25% interest would have no control over the company. Although Husband is retaining Wife's interest under the family court's order, fair market value assumes a hypothetical sale between a willing buyer and a willing seller. Husband is already the controlling shareholder, so obtaining Wife's 25% interest does not augment his control. Because Wife's minority interest is worth less than a pro-rata share of the company as a whole, it was proper to discount the value, as the market surely would.
Nevertheless, we find an effective 44% minority discount excessive. We find a 30% minority discount proper, which Stoddard acknowledged would be more in line with market ranges. Applying a 30% minority discount results in a $132,656 value for Wife's interest.
VII.
We therefore reverse the family court's valuation of Wife's 25% share of PCI, and order Wife be awarded $132,656 for her interest. We affirm the remainder of the family court's rulings, including the denial of attorney's fees to Wife.
AFFIRMED IN PART AND REVERSED IN PART.
SHORT and THOMAS, JJ., concur.