# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

George Wetherill Clark, Respondent-Petitioner,

v.

Patricia Brennan Clark, Petitioner-Respondent.

Appellate Case No. 2019-000442

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Greenville County
Harry L. Phillips, Jr., Family Court Judge

---

Opinion No. 27969
Heard December 12, 2019 – Filed May 13, 2020

---

## AFFIRMED IN PART & REVERSED IN PART

---

David Collins, Jr., of Collins Law Firm, of Greenville,
Ken Lester and Catherine Hendrix, of Lester & Hendrix,
of Columbia, all for Petitioner/Respondent.

David Wilson, of Wilson & Englebardt, LLC, of
Greenville, for Respondent/Petitioner.

---

**JUSTICE HEARN:** In this cross-appeal concerning the apportionment of marital assets, the issues before the Court emanate from the valuation of a minority interest in a family-held business. Specifically, the question is whether the court of appeals

erred in its handling of the family court's application of two discounts when determining the fair market value of a 25% interest for purposes of equitable apportionment—one for marketability and the other for a lack of control. Relying on *Moore v. Moore*, 414 S.C. 490, 779 S.E.2d 533 (2015), the court of appeals rejected the marketability discount but applied the lack of control discount. We now affirm in part and reverse in part, reiterating that the applicability of these discounts is determined on a case-by-case basis.[1]

## FACTS

George and Patricia Clark married in 1987 and filed for divorce twenty-five years later in 2012 after Husband discovered Wife had a multi-year affair with one of Husband's employees. The parties initially met while they attended college at Emory University, and they married after graduation. The couple had three children and lived in Greenville at the time of the divorce. Early on, Husband worked in sales with several different companies, but he eventually joined the family business, Pure Country, Inc.

Pure Country is located in North Carolina and specializes in custom tapestry blankets, afghans, pillows, tote bags, and other gift apparel. Husband's father established the company during the late 1980s, and it steadily grew. Along with his father, Husband's mother, sister, aunt, and niece also worked at the company. Husband's mother and father each owned a 37.5% interest in the Pure Country, and Husband's sister had the remaining 25% interest. However, approximately six weeks after Husband decided to join the business, his mother unexpectedly died of a heart attack. After the mother's death, Husband's father assumed her interest, meaning he had 75% while Husband's sister retained her 25% interest. Husband continued to work without any stock ownership. However, during this time, Husband's sister and brother filed a lawsuit against the father, alleging he was not competent to act in any capacity at Pure Country. When Husband supported his father, he was sued as well. Ultimately, the father transferred his 75% stock ownership to Husband, which the family court found was a gift and therefore nonmarital property.[2] During this time, the parties settled the lawsuit, as the sister sold her 25% interest to Husband for

---

[1] Unfortunately, this case represented one of the last matters before Judge Phillips, as he passed away in October 2015, only a month after ruling on Wife's post-trial motions. While Judge Phillips's tenure as a family court judge was far too brief, he nevertheless established himself as one of our finest trial judges.

[2] Whether Husband's 75% interest in Pure Country was marital or nonmarital was not appealed to this Court.

$400,000, to be paid over a fourteen-year period. As a result, the present value was approximately $98,000.

A year later, in 2006, several tragedies occurred, as Husband's brother and father died. Early in the summer of 2006, Husband's father was diagnosed with pancreatic cancer. During this time, his brother went missing, although the family did not initially realize this. Instead, Husband's sister informed everyone that their brother was busy—first saying he was on a ski trip and then that he had gone to Florida. Eventually, Husband grew concerned, and in September, police discovered part of the brother's remains in a shallow grave at his sister's house in North Carolina after one of her neighbors threatened to call police upon seeing what appeared to be a grave. Ultimately, the sister's husband was convicted of second degree manslaughter, and the sister pled guilty to accessory after the fact to second degree manslaughter in North Carolina.

As the marriage grew more strained, Wife asked Husband whether he would be amenable to her having a "sex surrogate." While both acknowledged conversations about a sex surrogate occurred, Husband claimed he rejected the idea, with Wife's paramour contending Husband knew and condoned the arrangement. From 2008-2012, Wife had an affair with Michael Thorstad, an employee of Pure Country. During this time, Wife approached Husband about obtaining equity in the business. In October 2009, Husband transferred a 25% interest to her, and the corresponding stock agreement contained a restriction that limited any subsequent sale to the business, other shareholders, or immediate family members. Eventually, in early 2012, Husband found a salacious picture on Wife's phone from Thorstad. In April of that year, Husband filed for divorce.

During the course of the eight-day trial, both parties called expert witnesses as to the value of Pure Country and Wife's 25% equity interest. Husband's expert was Catherine Stoddard and Wife's final expert was Marcus Hodge. Stoddard applied three different methods to value the business—the asset, market, and investment approaches. The asset approach consists of calculating the underlying assets and liabilities of the company. The market approach compares the business to other similar companies that have traded in private markets, and the income approach calculates the expected future economic benefits of ownership.

Under the income approach, Stoddard initially valued the 25% interest at $116,365. Importantly, she then applied a 35% marketability discount to account for several factors. Because Pure Country is a privately-held company, a buyer cannot purchase the interest on a publicly-traded market. Therefore, the sales process

involves higher transaction costs, as it usually takes more time and energy to find a broker and a willing private investor. Further, Stoddard testified that a closely-held corporation is less marketable and less liquid than a publicly traded business. Particularly relevant here, she also considered the stock agreement from the 2009 transaction that transferred the 25% interest to Wife. That agreement specifically provided:

4. Transfer of Stock

(a) General Rule. Unless otherwise provided in a bylaw adopted by the shareholders, no interest in Shares may be transferred, by operation of law or otherwise, whether voluntary or involuntary.

(b) Exception. Subsection (a) shall not apply to a transfer:
(1) To the corporation or to any other shareholder of the same class of shares.
(2) To members of the immediate family of a shareholder or to a trust all of whose beneficiaries are members of the immediate family of a shareholder. The immediate family of a shareholder shall include only lineal descendants (George P Clark, Abigail B Clark, Elizabeth M Clark) and spouses of any lineal descendants.

Stoddard cited this restriction as the reason she arrived at a higher marketability discount than she usually would apply.

Under the asset approach, she valued the entire company at $736,000 and applied both a marketability discount and a lack of control discount. As a result, she opined the 25% value was $83,724. Finally, under the market approach, she valued the 25% interest at $65,430. She weighed each method, and ultimately opined the value was $75,000, which included both a marketability and lack of control discount.

Conversely, Wife's expert, Hodge, opined the total value of the company was $1.8 million. Hodge also applied a marketability discount—finding a 26% reduction appropriate—but later suggested the value should not be discounted. Unlike Stoddard, Hodge's valuations addressed the value of the company as a whole rather than specifically analyzing the effect of owning a minority interest. Hodge noted, "I valued 100 percent of the equity in Pure Country." In response to whether he valued the 25% interest, he stated, "I did. And it's just a straight 25% interest."

The family court found Stoddard to be more credible, as she thoroughly explained the basis of her opinions, providing the reasons she chose to apply the

discounts. Further, the court rejected Hodge's opinion, which compared Pure Country to other purportedly similar businesses, finding, "The problem…is the lack of evidence as to whether the mills [Wife's expert] compared with [Pure Country] are in fact comparable in scope, size, and lines of manufacturing." The court acknowledged the "debate as to whether…discounts should apply in a divorce setting as the business is actually not being sold." However, it correctly recognized that the valuation standard is to determine an asset's fair market value, which assumes a hypothetical sale between a willing buyer and seller. Accordingly, the court agreed with Stoddard and found the value of the 25% interest was $75,000.

On appeal, the court of appeals affirmed in part and reversed in part. *Clark v. Clark*, 425 S.C. 453, 463, 823 S.E.2d 200, 205 (Ct. App. 2018). The court rejected the marketability discount, relying on *Moore*. Because there was no evidence that Husband intended to sell the business, the court noted, "[T]o the extent the marketability discount reflected an anticipated sale, *Moore* deems it a fiction South Carolina law no longer recognizes." *Id.* at 463–64, 823 S.E.2d at 205. Further, concerning the stock restriction that limited transferability to immediate family members, the court stated,

> If, though, Husband has no plans to sell PCI then the stock restriction's effect on value is just as phantom as the discount rejected in *Moore*; both concern liquidity, which *Moore* held irrelevant to the fair market value of a closely held business for equitable distribution purposes when one spouse intends to retain ownership. We therefore hold use of the marketability discount improper under these specific facts.

*Id.* at 464, 823 S.E.2d at 205–06.

Conversely, the court of appeals affirmed the family court's decision to apply a lack of control discount because a minority shareholder would not have control over the company. *Id.* at 467, 823 S.E.2d at 207. However, the court of appeals found Stoddard used an effective 44% lack of control discount, which it deemed excessive. Ultimately, the court determined the marketability discount did not apply, and only a 30% lack of control discount applied, meaning the 25% share was valued at $132,656. Both parties filed a petition for certiorari, which we granted as to the application of these two discounts.

## ISSUES

I.     Did the court of appeals err in reversing the family court's decision to apply a marketability discount to Wife's minority interest in Pure Country?

II. Did the court of appeals err in affirming the application of a lack of control discount?

## STANDARD OF REVIEW

Unless the family court's decision is evidentiary or procedural, the appropriate standard of review from the family court is de novo. *Stoney v. Stoney*, 422 S.C. 593, 596, 813 S.E.2d 486, 487 (2018). However, even under our de novo review, we recognize the family court is in the best position to determine credibility. *Lewis v. Lewis*, 392 S.C. 381, 384, 709 S.E.2d 650, 651 (2011). Further, our de novo review does not discard "the longstanding principles that trial judges are in superior positions to assess witness credibility and that appellants must show the trial judge erred by ruling against the preponderance of the evidence . . . ." *Stone v. Thompson*, 428 S.C. 79, 91–92, 833 S.E.2d 266, 272 (2019).

## DISCUSSION

### I. Marketability Discount

Husband contends the court of appeals erred in rejecting a marketability discount when both parties' experts applied the discount to varying degrees. Wife contends this discount does not apply because it accounts for the higher transaction costs inherent in a sale, which Husband has no intention of doing. We agree with the family court that a marketability discount applies.

A party's interest in a closely held corporation is valued according to its fair market value. This valuation principle is defined as "the amount of money which a purchaser willing but not obligated to buy the property would pay an owner willing but not obligated to sell it, taking into account all uses to which the property is adapted and might in reason be applied." *Reid v. Reid*, 280 S.C. 367, 373, 312 S.E.2d 724, 727 (Ct. App. 1984). This well-established standard assumes a hypothetical sale between a willing buyer and a willing seller. *Id.* However, tension has long existed between proper business valuation principles and the desire to fairly and justly apportion marital assets. Indeed, in *Moore*, this Court acknowledged, "The familiar tension between a family court's goal of equity and recognized valuation principles may be explained, at least in part, due to the absence of a true willing buyer and willing seller in marital litigation." 414 S.C. at 508, 779 S.E.2d at 542. Further, the court noted, "While a traditional approach to valuation may often be dispositive in a family court setting, we recognize that flexibility must exist to allow our family court judges (and appellate courts under de novo review) discretion to fashion equitable

relief under the facts and circumstances presented." *Id.* at 525 n.12, 779 S.E.2d at 552 n.12. However, this does not mean that we, as an appellate court, should disregard the testimony and credibility determinations supported by the record under the auspice of de novo review. *See Lewis*, 392 S.C. at 390, 709 S.E.2d at 654. Certainly, if we value flexibility in how the family court apportions the parties' marital assets—which we clearly do—we should consider that court's decision when it has chosen to accept the parties' expert testimony that a marketability discount applies and when the court has found one party's expert more credible. The family court's flexibility in its equitable apportionment must go both ways; otherwise, we risk effectively imposing a bright-line rule where we have previously declined to do so.

In *Moore*, the primary issue concerned whether a privately-held business's goodwill may be marital property. 414 S.C. at 508, 779 S.E.2d at 542. The Court concluded enterprise goodwill is marital property while personal goodwill is not. *Id.* at 512, 779 S.E.2d at 544. Additionally, the parties disputed whether a marketability discount applied, with the wife's expert, Raymond McKay, testifying that a 20% discount was appropriate "to reflect the illiquidity or lack of marketability of shares of a closely held business." *Id.* at 506, 779 S.E.2d at 541. However, the wife's other expert did not believe a marketability discount was appropriate because neither party contemplated a sale nor did any extraordinary circumstances exist. *Id.* at 526 n.13, 779 S.E.2d at 551 n.13. Further, the husband's expert also did not believe a marketability discount applied because the business could be sold "fairly readily." *Id.* at 507, 779 S.E.2d at 542. With these facts, the Court declined to apply a marketability discount, and in doing so, reiterated that whether such a discount applies is determined on a case-by-case basis. The Court noted,

> We decline to impose a bright line rule regarding the appropriateness of such discounts in all family court business valuations, but we find no justification for discounting the value of Candelabra in this case due to lack of marketability. Because Wife will retain ownership of Candelabra, we see no legitimate reason to indulge in the fiction of a marketability discount.

*Id.* at 525, 779 S.E.2d at 551. In addition, the Court stated,

> McKay in his report noted the often-made argument that "since a sale of the company is not anticipated as a consequence of most divorce litigation, no [marketability discount] should apply." McKay opted for a marketability discount, and understandably so, in his faithful

adherence to the concept of "fair market value." We do not address, and leave for another day, other discounts generally associated with determining fair market value.

*Id.* at 525 n.14, 779 S.E.2d at 552 n.14. The Court cited *Fausch v. Fausch,* 697 N.W.2d 748, 752 (S.D. 2005) for the proposition that whether a marketability discount is appropriate when no sale is contemplated is determined on a case-by-case basis—a prevalent position across the country. *See, e.g.*, *In re Marriage of Thornhill*, 232 P.3d 782, 786 (Colo. 2010) (finding "the trend appears to go against such per se rules" prohibiting marketability discounts when valuing a closely held corporation in marital litigation); *Priebe v. Priebe*, 556 N.W.2d 78, 82 (S.D. 1996) (finding that the "common thread" when determining whether to apply a discount is that the "issue…must be dealt with by trial courts on a case-by-case basis"); *Cobane v. Cobane*, 544 S.W.3d 672, 680 (Ky. Ct. App. 2018) (finding that the "common thread" in all cases involving the "determination of whether to apply a minority discount lies within the discretion of the trial court based upon the facts of the particular case."); *Schickner v. Schickner*, 348 P.3d 890, 894 (Ariz. Ct. App. 2015) (noting that the majority of jurisdictions decline to adopt bright-line rules when valuing minority interests in a domestic relations case).

The court of appeals acknowledged the case-by-case standard, yet its position effectively established a bright-line rule disallowing this discount. While the family court, and appellate courts under de novo review, must have some flexibility in crafting a fair equitable apportionment, the court of appeals' decision alters the fair market value standard that has heretofore guided valuation. As other jurisdictions that employ the fair market value standard have done, we believe the best approach is to allow our family court judges discretion to apply these discounts on a case-by-case basis. *See In re Marriage of Thornhill*, 232 P.3d at 787 ("[T]he approach that is more in line with the trial court's broad discretion in determining the equitable division of marital property in such proceedings is to allow such courts the discretion to determine whether to apply a marketability discount based upon the facts and circumstances of the parties and marriage in a particular case."); *Fausch*, 697 N.W.2d at 752–53 ("Whether or not it is fair or appropriate to apply a discount in a divorce case where no immediate sale is contemplated is for the trial court to determine based upon the evidence of the case."); *May v. May*, 589 S.E.2d 536, 550 n.22 (W. Va. 2003) ("A discount for lack of marketability occurs when there is evidence that a business will receive less than its true value in a sale for any number of reasons . . . The family court judge rejected the 20% discount for lack of marketability, on the grounds that there was no evidence that the practice would actually be sold. To accept this reasoning as a basis for rejecting the 20% discount

would make such discounts inappropriate in all divorce cases. As a practical matter, business valuations in divorce cases will generally be done on the basis of a theoretical sale, as opposed to an actual sale."); *Telfer v. Telfer*, 558 S.W.3d 643, 655–56 (Tenn. Ct. App. 2018) ("Generally, applicability of the use [of] a lack of marketability discount depends on the characteristics of the ownership interest being valued, not whether the owner of the interest actually intends to sell the interest."); *Id.* ("[C]ourts sometime[s] find application of a lack of marketability discounts inappropriate, but in many instances, the decision to apply the discount is seen as discretionary."); *Alexander v. Alexander*, 927 N.E.2d 926, 939 (Ind. Ct. App. 2010) (noting that family courts have broad discretion to apply marketability discounts and that courts "should be able to determine the present value of a spouse's ownership interest in light of marketability and minority shareholder discounts"). Recognizing the discretion afforded to the family court concerning the propriety of a marketability discount implicitly underscores the fact-intensive nature of our review. *See, e.g.*, *In re Marriage of Thornhill*, 232 P.3d at 787 (noting the court's broad discretion to apply a marketability discount based on the facts of the case). Even our de novo standard acknowledges we are not in the best position to make a credibility determination, nor are we inclined to minimize the family court's reliance on both parties' initial acceptance of this discount. While some jurisdictions categorically prohibit marketability discounts when apportioning marital assets, we continue to reject this approach.[3]

Accordingly, with these principles guiding our analysis, we turn to the facts of this case to determine whether the family court erred in applying a marketability discount. As the family court correctly noted, both experts initially applied a marketability discount, with Wife's expert only later backpedaling at the direction of her counsel. This is in contrast to the situation in *Moore*, where experts for both parties testified to varying degrees that a marketability discount was not appropriate.

---

[3] We disagree with the dissent that its position does not abandon the principles of fair market value because it removes the concept of a hypothetical sale, which is the basis for projecting the asset's value. The dissent would hold that the application of a marketability discount is inappropriate because the husband does not intend to sell the business; however, this ignores the fact that South Carolina embraces fair market value, which is not controlled by an owner's intent—rather it reflects the time it would take to sell the asset in question. Instead, consistent with our longstanding jurisprudence concerning business valuation principles, we reiterate whether a marketability discount is appropriate when calculating an asset's fair market value is determined on a case-by-case basis.

*Moore*, 414 S.C. at 525 n.13, 779 S.E.2d at 551 n.13. While we acknowledge that one of the wife's two experts in *Moore* applied a marketability discount, the other did not. *Moore*, 414 S.C. at 525, 779 S.E.2d at 551. Further, expert testimony demonstrated the business could be sold "fairly readily." *Id.* at 507, 779 S.E.2d at 542. Conversely, Stoddard thoroughly explained her valuations and the reasons justifying applying this discount. She began with the fact that Pure Country is a privately held business, meaning it is less marketable and less liquid than its publicly traded counterpart. Additionally, the stock transfer agreement severely restricted the pool of potential buyers, further affecting liquidity. With so few potential buyers, Stoddard understood that prospective purchasers would have leverage in negotiating a price for Wife's 25% interest.

Hodge based his opinions in part on a comparative sales analysis where he selected sales of purportedly similar businesses as a benchmark for Pure Country's value. While the comparative businesses consisted of those in the mill industry in North Carolina, we agree with the family court that Hodge did not provide evidence demonstrating that a hypothetical buyer would actually compare these businesses when valuing Pure Country. For example, Hodge did not explain the size, scope, and lines of manufacturing of the comparative businesses; accordingly, faced only with Hodge's general conclusion, the family court rejected Wife's valuation. Moreover, Hodge's opinions concerning comparative sales exemplified his overall testimony, leading the family court to find Stoddard's valuation "more thorough, reasoned, and better articulated than Mr. Hodges." As a result, we agree with the family court that the fair market value of Wife's 25% interest should be discounted based on the nature of the company. The value of this minority interest would certainly be impacted in a transaction between a willing buyer and seller. Because the marketability discount accounted for these facts, we agree with the family court's decision to apply it.

## II.    Lack of Control Discount

Wife contends the court of appeals erred in applying the lack of control discount because Husband will own 100% of the company after the apportionment. Husband asserts the preponderance of the evidence supports applying the discount to ascertain the fair market value of Wife's 25% interest. We agree a lack of control discount applies here.

A lack of control discount—also commonly referred to as a minority discount—accounts for the minority interest's inability to control the business. The minority status certainly affects an asset's fair market value, and therefore, it is proper for courts to consider the propriety of this discount. We have previously done

so in other contexts. *See Dowling v. South Carolina Tax Commission*, 312 S.C. 194, 439 S.E.2d 825 (1993). In *Dowling*, five children received stock from their parents as a gift. The IRS believed the parents had undervalued the stock, but the trial court disagreed and accepted the 30% discount for lack of control. This Court affirmed and noted, "The majority of courts have found that minority interest discounts are appropriate within the familial context." *Id.* at 198, 439 S.E.2d at 828. The Court concluded, "We decline to hold that as a matter of state law, minority stock discount for family-held corporations are not allowed."[4] *Id.*

Wife contends the court of appeals erred by not following its precedent, specifically *Fields v. Fields*, 342 S.C. 182, 536 S.E.2d 684 (Ct. App. 2000). In *Fields*, the husband was a minority shareholder in three privately-held businesses, one of which he served as vice president. The wife's father was the controlling shareholder of that business, and the family court awarded the husband's 18% interest to the wife because she could readily sell that portion to the controlling shareholder—her father. Conversely, if the husband retained ownership of the stock, he likely would be "squeeze[d] out," as the wife's father had already removed him from the board and fired him. *Id.* at 189, 536 S.E.2d at 688. The husband's expert testified that usually a minority discount is appropriate to account for the minority

---

[4] We disagree with the dissent that *Dowling*, grounded on different facts, is irrelevant to our decision. We find the basic principle expressed in *Dowling*—that we do not impose a categorical rule prohibiting lack of control discounts in the familial context—is sound and applicable here. Accordingly, our analysis turns on the facts of this case, including the experts' testimony and the family court's credibility determinations. Concerning credibility, we recently explained that a factfinder may not "give artificial importance to a credibility determination when credibility is not a reasonable and meaningful basis on which to decide a question of fact." *Crane v. Raber's Disc. Tire Rack*, Op. No. 27951 (S.C. Sup. Ct. filed April 29, 2020) (Shearouse Ad. Sh. No. 17 at 26). Unlike the reliance on a credibility determination that had no basis in the record and where objective medical evidence rebutted the Workers' Compensation Commission's findings, the family court's credibility determination was thorough and relevant to valuing Wife's 25% interest. Further, the determination of fair market value in domestic litigation is a question of fact that almost always involves expert testimony. *See Lewis*, 392 S.C. at 391, 709 S.E.2d at 655 (noting the determination of fair market value is a question of fact). Because we are easily able to discern the family court's credibility determination from the record and that finding is paramount in weighing the competing expert testimony, we reject the dissent's willingness to discard it.

shareholder's lack of control, but that the stock's value would be higher if allocated to the wife because she could consolidate it with her father's controlling interest.

On appeal, the wife contended the family court erred in accepting this testimony, which implicitly rejected a lack of control discount, because there was no way to know what the father would do in the future. *Id.* The court of appeals affirmed the family court's decision, noting the discretion afforded in selecting competing valuations. Ultimately, the court of appeals found the family court did not abuse its discretion, the applicable standard of review at the time. *Id.* at 190, 536 S.E.2d at 688.

We agree with the court of appeals that "*Fields* is best limited to its facts and cannot be read as barring discounting the value of a spouse's minority interest anytime the other spouse owns (or is aligned with the owner of) a majority of the closely held business." *Clark*, 425 S.C. at 464, 823 S.E.2d at 206. The court did not examine the concept of fair market value, and therefore, there is no evidence whether the family court deviated from this standard when apportioning the marital property.

Moreover, as is the case for marketability discounts, our valuation standard is fair market value, not fair value. *See Brown v. Brown*, 792 A.2d 463, 476 (N.J. Super. Ct. App. Div. 2002) ("'Fair value' is not the same as, or short-hand for, 'fair market value.' 'Fair value' carries with it the statutory purpose that shareholders be fairly compensated, which may or may not equate with the market's judgment about the stock's value. This is particularly appropriate in the close corporation setting where there is no ready market for the shares and consequently no fair market value."). We profoundly disagree with Wife's and the dissent's assertion they are not abandoning the principles of fair market value because they are removing the fundamental aspect of fair market value—projecting the value attributed by a willing buyer and seller in a hypothetical sale. Further, the dissent's conclusion that a discount for lack of control is improper fails to consider the impact on the value of Wife's 25% share and would essentially change our State's approach to valuations to a fair value standard.

Although the family court retains discretion to reject this discount in other cases, here, the court chose to accept Stoddard's opinion, finding Stoddard more credible than Wife's expert. Moreover, Wife's expert never attempted to value the 25% interest separately, as he incorrectly assumed that Husband's 75% stake was marital. Instead, he merely calculated the value of the business as a whole and divided it by four. A hypothetical buyer would certainly require more than a simple mathematical exercise given the inability to exert control. Because the buyer would

be at the whim of the majority, it would be difficult to find a buyer willing to pay a proportionate amount. These considerations all affect the asset's fair market value, which drives valuation. Accordingly, our review of the record supports the family court's decision to apply a lack of control discount. Nevertheless, as a matter of arithmetic, we agree with the court of appeals that Stoddard mistakenly applied a 44% discount rather than a 30% reduction. Husband acknowledged at oral argument that he did not challenge this reduction; accordingly, the 25% share of Pure Country is valued at $86,226.[5]

## CONCLUSION

Based on the foregoing, we affirm in part and reverse in part, reiterating that whether a marketability discount or a lack of control discount is appropriate when apportioning marital assets is determined on a case-by-case basis.

**AFFIRMED IN PART AND REVERSED IN PART.**

**BEATTY, C.J., and KITTREDGE, J., concur. JAMES, J., dissenting in a separate opinion in which FEW, J., concurs.**

---

[5] The court of appeals rejected the marketability discount but applied a 30% lack of control discount, which resulted in a $132,656 value for the 25% interest. Husband did not object to the court's decision to reduce the lack of control discount from 44% to 30%, so we used the $132,656 figure and then applied the 35% marketability discount.

**JUSTICE JAMES:** I respectfully dissent. I agree with the majority that our holding in *Moore v. Moore*, 414 S.C. 490, 779 S.E.2d 533 (2015), does not create a bright-line rule prohibiting the application of a marketability discount in cases in which there is no evidence that a sale of the business is contemplated. However, I would hold that under the facts of this case, a marketability discount was not appropriate. I would also hold there should be no discount for lack of control. Therefore, I would affirm the court of appeals in result as to the marketability discount and would reverse the court of appeals as to the minority discount.

### Marketability Discount

Husband's expert, Catherine Stoddard, applied a 35% marketability discount to Wife's 25% interest in Pure Country. I believe a marketability discount should not be applied in this case.

I agree with the majority that *Moore v. Moore* did not create a bright-line rule prohibiting the application of a marketability discount in cases in which there is no evidence a sale of the business is contemplated. However, I believe the result reached by the court of appeals is correct, as the facts of this case are not meaningfully different from the facts in *Moore*. Here, as in *Moore*, one spouse owns a minority interest in a business, and the minority interest is marital property. Here, as in *Moore*, the other spouse owns the entire remaining interest in the business. Here, as in *Moore*, the minority interest is to be conveyed by court order to the spouse who already owns the entire remaining interest. Here, as in *Moore*, there is no evidence the spouse who will own the entire remaining interest intends to sell the business. In *Moore*, we stated, "Because Wife will retain ownership of [the business], we see no legitimate reason to indulge in the fiction of a marketability discount." 414 S.C. at 525, 779 S.E.2d at 551. Here, the fiction of a marketability discount is just as apparent, and the rejection of the discount in this case would be no more a rejection of the principles of fair market value than was our holding in *Moore*.

The majority emphasizes that Wife's expert, Marcus Hodge, initially testified on direct examination that he had applied a 25% marketability discount to the entire business, which of course translated to a 25% marketability discount for Wife's interest. Hodge later testified on direct that because Husband did not intend to sell Pure Country, "the marketability discount at that point becomes kind of arbitrary . . . it really provides a discount that falls in his favor." The majority characterizes this portion of Hodge's testimony as "backpedaling," but I do not. A full reading of his testimony establishes that Wife's counsel was simply guiding

Hodge through his valuation of Pure Country and asking him to assume certain facts, one of which was that Husband does not intend to sell the business. That was not backpedaling, but rather a recognition of reality. In essence, Hodge's testimony, given in October 2014, recognized what we held to be appropriate exactly one year later when we decided *Moore*: under certain facts, faithful adherence to the concept of fair market value must yield to reality. Here, the reality is that Husband will now have ownership of 100% of Pure Country. *See Moore*, 414 S.C. at 525 & n.14, 779 S.E.2d at 551 & n.14.

I have one final comment upon the application of a marketability discount. Stoddard testified she applied a higher marketability discount to Wife's interest than she normally would because of the transfer restrictions placed on Wife's shares at the time Wife acquired the shares from Husband. The record does not reflect how much of Stoddard's 35% marketability discount is attributable to the transfer restrictions. At the least, even if some marketability discount is appropriate, the stock transfer restrictions should not be a factor. Once Wife's shares are transferred to Husband, there will be no motivation for Husband to keep the restrictions in place; therefore, the financial relevance of these transfer restrictions is illusory.

## Lack of Control/Minority Discount

Under the facts of this case, I would not apply a discount for lack of control. Also called a "minority discount," this type of discount recognizes the reality in many business settings that the interest of a minority shareholder is worth less because that shareholder has no control over the operations of the business, the use or liquidation of assets, or the distribution of income or earnings. The travails of the minority owner are true in the abstract; however, in this case, the devaluing effect of lack of control upon Wife's shares will vanish the instant Husband acquires her shares.

Stoddard was asked on cross-examination if Husband would receive a windfall if Wife's shares were subjected to a minority discount on the front end and then transferred to Husband. Stoddard's response explains in a nutshell the fallacy of applying the minority discount under the facts of this case: "Well, the value in [Husband's] hands would be higher than the value in [Wife's] hands, I think, if that's what you're asking." Stoddard then tried to "backpedal" by referencing the devaluing effect of the stock transfer restrictions, which, as discussed above, are illusory as to Husband.

The court of appeals and the majority cite *Dowling v. South Carolina Tax Commission*, 312 S.C. 194, 439 S.E.2d 825 (1993), for the proposition that it is appropriate for courts to consider the propriety of a minority discount. I have no quarrel with that basic proposition, but just because it is generally proper for courts to consider the propriety of a minority discount does not mean the discount should be applied in this case. In *Dowling*, Mr. and Mrs. Dowling gifted their five children 2,000 shares of stock in Sherwood, Inc. (representing all shares in the corporation) in equal shares over two years. The South Carolina Tax Commission claimed gift tax deficiencies for those two years, and litigation ensued in the circuit court. The children argued their respective interests in the corporation should be subjected to a minority discount, and the Tax Commission argued a minority discount should not be allowed "when the aggregate of the family holdings creates a majority interest in the corporation." *Id.* at 198, 439 S.E.2d at 828. The circuit court rejected this argument and found the value of the interests held by each child should be discounted because each child held a minority interest in the corporation. This Court affirmed, declining to hold that minority discounts for family-owned businesses are not allowed in South Carolina. *Id*. at 198-99, 439 S.E.2d at 828.

The factual distinctions between *Dowling* and this case illustrate the point that courts should not apply minority discounts at the expense of uncontroverted facts. Even though *Dowling* and the instant case both involve family-owned businesses, each of the five children in *Dowling* intended to retain their respective 20% interests, and the application of a minority discount to each child's interest reflected that reality. In contrast, in the instant case, the reality is that Husband will assume ownership of Wife's 25% interest in Pure Country, giving him a 100% interest. The propriety of the application of a minority discount to five equal minority interests of a family business for the legitimate purpose of gift tax avoidance is very different from the equitable distribution of a marital asset between a husband and wife, particularly when the spouse with a controlling interest is awarded ownership of the other spouse's minority interest.[6]

## Conclusion

The result I support would not require the abandonment of the principles of fair market value. Principles of fair market value do indeed form the starting point for the valuation of a marital asset; however, when facts and common sense dictate,

---

[6] In my view, this is true even though only 25% of Pure Country is marital property.

courts should avoid an approach that results in a fictional value being assigned to the asset.

 As to the marketability discount, I would affirm the court of appeals in result. As to the minority discount, I would reverse the court of appeals.

**FEW, J., concurs.**